Filed 3/28/16

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S076785 |
| v. | ) | |
| | ) | |
| PEDRO RANGEL, JR., | ) | |
| | ) | Madera County |
| Defendant and Appellant. | ) | Super. Ct. No. M13413A |
| _____ | ) | |

A jury convicted defendant Pedro Rangel, Jr., of the first degree murders of Juan Uribe and Chuck Durbin. (Pen. Code, § 187, subd. (a); *id*., former § 189.) The jury also found true a multiple-murder special-circumstance allegation and, as to Durbin's murder, a personal firearm use sentence-enhancement allegation. (Pen. Code, § 190.2, subd. (a)(3); *id*., former §§ 1203.06, subd. (a), 12022.5, subd. (a).) The jury returned a death verdict and the trial court entered a judgment of death. This appeal is automatic. (Cal. Const., art. VI, § 11, subd. (a); Pen. Code, § 1239, subd. (b).) For the reasons that follow, we affirm the judgment.

## I. FACTUAL BACKGROUND

### A. Guilt Phase

On the night of October 7, 1995, defendant, his son Pedro Rangel III (Little

Pete),**1** Rafael Avila, and Richard Diaz drove to the Madera home of Chuck Durbin in search of Juan Uribe. Defendant and Little Pete entered the home and shot and killed Durbin and Uribe and wounded Durbin's wife Cynthia (Cindy) Durbin.

Little Pete's case was severed from defendant's before trial. Avila fled after the crime but Diaz testified against defendant at trial.**2** Defendant was also linked to the crime by his statements and by ballistics evidence.

1. *Prosecution evidence*

a. *Events before the murders*

On September 23, 1995, about two weeks before Uribe's murder, he and Martha Melgoza, the mother of his daughter, attended a baptism party at a Madera reception hall. They saw Little Pete arguing with Carlos Romero and David Varela. Uribe was good friends with both Little Pete and Varela. Jesse Candia, Varela's uncle, suggested Little Pete and Varela "fight and get it over with," but Varela refused, explaining Little Pete had a gun. Candia and Romero told Little Pete to leave the party, and Romero punched Little Pete in the face. Little Pete looked at Uribe and asked him, "[W]hat's up?" and "Juan, why don't you back me up?" Juan shook his head and said, "No" and "It was none of my business." Little Pete left in his BMW.

---

**1**     At trial, the parties and witnesses referred to defendant as "Big Pete" and to his son as "Little Pete."

**2**     Diaz testified before the jury that he pled guilty to violating Penal Code section 32 or accessory after the fact. He had not yet been sentenced but understood it was possible he would serve either prison time or time on probation and was required to tell the truth.

Little Pete told Richard Diaz he was upset with Uribe for not backing him up and wanted to get even. Little Pete, Diaz, and Florentino (Tino) Alvarez slowly drove by the baptism party in Little Pete's BMW but did not stop. Diaz described how "everybody started running" and "they shut the front doors."

Melgoza and Uribe left the party later that evening. As they drove, they were stopped by Little Pete and Tino Alvarez. When Uribe got out of the car to see what the men wanted, Alvarez asked him why he had hit Little Pete. Uribe denied hitting Little Pete, and said Little Pete should know who hit him. Alvarez punched Uribe.

Later that night, Varela was driving a friend home from the baptism party when he saw Uribe, Romero, and several others standing on the street. Little Pete drove by in his BMW with Diaz in the front seat. Several shots were fired out of the passenger side of the BMW. As Varela drove away, more shots were fired. He noticed Little Pete's BMW behind him. A bullet grazed Little Pete's head.

On September 24, 1995, Jesse Rangel, defendant's nephew, who was living in Fresno, learned that his cousin Little Pete had been shot. Jesse[3] visited Little Pete in Madera. Tino Alvarez told Jesse that Juan Uribe had shot Little Pete. In retaliation, Jesse and Alvarez fired several bullets into Uribe's car. Jesse did not see Uribe or anyone else in the area, and there had been no discussion of shooting Uribe if they saw him. At trial, Jesse denied ever shooting at Uribe.

### b. Events on the night of the murders

On October 7, 1995, Richard Diaz attended a barbecue at defendant's house. Little Pete and Rafael Avila, who was married to defendant's stepdaughter Endora

---

[3] To avoid confusion, we refer to some Rangel family members by their first names.

Avila, also were there. Defendant was angry about his son "getting shot in the head" and spoke about "getting back" at Juan Uribe. Defendant said "he wasn't going to let anybody get away with shooting his son in the head," and wanted to go look for Uribe.

Defendant asked to borrow Avila's car but Avila told defendant he would drive because defendant "was too drunk." Defendant, Diaz, Little Pete, and Avila got into Avila's car. They drove to Uribe's house but did not see his car there. As they drove to a different location, they noticed Uribe's car parked across the street from victim Durbin's home on East Central Avenue in Madera. Durbin lived with his wife Cindy and three children, who were seven, six, and three years old. The Durbins also had three visitors that night, Juan Uribe, Alvin Areizaga, and Richard Fitzsimmons. Diaz saw people in the house and noticed that two children were watching television in the front room.

Defendant, Little Pete, and Diaz got out of the car, and Avila drove away slowly. About 10:00 p.m., Diaz stood across the street while defendant, armed with a .380-caliber weapon, and Little Pete, armed with a .22-caliber rifle, entered the house through an unlocked screen door.

Little Pete asked where Juan Uribe was. When Uribe appeared, Little Pete asked him: "What's up, Juan Uribe? What's up now?" He then shot and killed Uribe. Durbin ran through the living room but defendant grabbed him and shot him. From across the street, Diaz fired two shots through the living room window to encourage defendant and Little Pete to leave. Defendant and Little Pete ran out of the house, and Diaz stopped Avila, who was driving by. The men got into the car and drove off. Little Pete said that he "got Juan Uribe" and thought he had killed him. Defendant said that he had shot Durbin because he thought he was "running to get a gun." Defendant accidentally fired two shots in the car while trying to unload his weapon.

4

Cindy Durbin, Chuck Durbin's wife, testified she heard a big bang and walked into the living room to check on her children. She saw two armed Hispanic men with dark hair and wearing baseball caps standing in the house; she was "80 to 90 percent sure" one of the men was defendant. The men began shooting and one or both "scream[ed]" they were "going to get" Juan and said "Juan was a traitor" and "now he was dead" or "going to die." Cindy ran into the kitchen where Chuck told her to hide. Chuck ran into the living room. When the shooting stopped, Uribe's bullet-ridden body was on top of Cindy. Cindy had been shot in the abdomen, and bullets had grazed her legs. She found Chuck with bullet holes in his head and neck on the living room floor. He raised his hands to his face and tried to speak but she could not understand him. She took their children into a bedroom and asked Areizaga to call 911.

### c. *Events after the murders*

On the night of October 7, 1995, Endora Avila, defendant's stepdaughter and Rafael Avila's wife, was returning from a church revival when she saw Rafael's car "flying" across Yosemite Street in Madera. When Endora arrived home, Rafael was not there. Rafael came home later that night and "banged on the door like a cop." He was "[n]ervous" and pulled on his hair. His pants were wet almost to his knees. Rafael removed his clothes and threw them in the trash. Later that night Endora's stepbrother, Little Pete, "bang[ed] on the door" and he and Rafael argued. Endora did not see Rafael the next day, and had only seen him once since that night for about a 15-minute period.

Also on the night of October 7, 1995, during the 10:00 o'clock news, Jesse Rangel, who was in Fresno, received a telephone call from Little Pete. Little Pete told Jesse he "got Juan." Later that night, Jesse was awakened by a second call from Little Pete, who sounded drunk and was laughing. Little Pete said he had

5

killed "Juan," and that defendant, "Richard, [and] Rafael" also were involved. Defendant then came on the line laughing and said he "put those motherfuckers on ice."

One night in October 1995, defendant gave Juan Ramirez, who was married to defendant's stepdaughter Deanna, a basket covered with bags and clothing and asked him to "do him the favor of throwing that away." Defendant also said they "had resolved their problem." When Ramirez disposed of the basket near a canal, he noticed it contained two weapons. He later showed police where the weapons were located. The weapons were a .380-caliber semiautomatic handgun, and a .22-caliber semiautomatic rifle. Ballistics testing revealed that the .380-caliber bullets found at the crime scene and in Avila's car had been fired from the same gun and "probably" had been fired from the .380-caliber handgun. All sixteen .22-caliber casings found at the crime scene had been fired from the rifle. The rifle, or a similar weapon, had fired the .22-caliber bullets recovered from Uribe's and Durbin's bodies.

The day after the murders, Jesse Rangel, defendant, and Little Pete paid a surprise visit to defendant's brother, Frank Rangel, Sr. (Frank Sr.), and his son, Frank Rangel, Jr. (Frank Jr.), in Fresno. Frank Jr. had not seen defendant and Little Pete for about seven years.[4] During the visit, defendant told Frank Sr. that defendant and Little Pete "had went and done a shooting," and told Frank Jr. "[t]hey went to the house and shot the house up." Also during this visit, Little Pete described the shootings to Jesse, saying defendant had a .380-caliber handgun, Little Pete had a .22-caliber rifle, and Diaz had a .38-caliber handgun. "Rafael had dropped him off. They . . . walked to the house . . . [and] [h]e opened

---

[4] Frank Jr. was granted use immunity for any action with respect to the case after October 7, 1995.

6

the door. . . . He went off in the house looking for Juan." Diaz stayed outside across the street. Little Pete "shot Juan." Chuck Durbin came out "from the side" and defendant "shot him in the head." Defendant later gave the guns to his stepdaughter's husband Juan to dispose of them.

During his visit to Fresno, defendant gave Frank Jr. a .38-caliber revolver and asked Frank Jr. to "hold this for me." Frank Jr. hid it outside, and later showed law enforcement officers where the gun was hidden. The gun "matched" the .38-caliber bullets found at the crime scene.

A few days after the murders, Erica Rangel, Jesse Rangel's wife, was in a motel room with defendant's wife Mary, defendant, Little Pete, and Jesse Rangel. Mary told defendant, "You're a murderer. And now my son is one, too." Defendant did not respond.

The prosecution introduced evidence of defendant's efforts to create an alibi. The prosecution introduced the testimony of Sanjeevider (Romi) Singh, who, at the time of the murders, was the boyfriend of defendant's stepdaughter, Carmina Garza, and owned a convenience store. Garza helped Singh manage the store. On October 8, 1995, defendant and Little Pete worked in Singh's store for about 45 minutes until about 10:20 p.m., where they were videotaped on the store security system. Garza mislabeled the tape October 7, 1995. While they were in Fresno visiting Frank Sr. and Frank Jr., Little Pete told Jesse Rangel he and defendant had made a video showing them working at the store, and that Singh was "supposed to switch the dates" on the tape so it looked like they were at the store mopping at the time of the murders. Little Pete made a similar but less detailed statement to Diaz.

Defendant voluntarily spoke to police and his statement was played for the jury. He said that on October 7, 1995, the night of the murders, he and Little Pete left the barbecue to go to Romi Singh's convenience store. They arrived before 10:00 p.m., worked for 35 to 40 minutes in the store, and left sometime after

7

10:00 p.m. He agreed with the interviewing officer he would be "shock[ed]" to learn the videotape showing this activity was actually taped on October 8, 1995, and denied being in the store on that date.

The prosecution also introduced evidence of defendant's flight. The parties stipulated defendant worked at FMC Corporation from August 11, 1980, to October 16, 1995, when he voluntarily terminated his employment for personal reasons, and that defendant did not work from October 10 to October 15, 1995. Jerry Smith, who worked with defendant, testified that defendant had worked on Monday, October 9, 1995, the first Monday after the murders, but did not work after that date. On about October 16, 1995, defendant called Smith and asked for a one-year leave of absence. Smith told defendant he would refer the matter to the plant supervisor because he could not authorize the time off.

### 2. *Defense evidence*

Defendant introduced pretrial statements by Cindy Durbin, Richard Diaz, and others that differed from their trial testimony.

Richard Fitzsimmons testified he was in the Durbin kitchen on the night of the murders. He heard gunshots and saw two Hispanic males no more than 30 years old. He had used methamphetamine at the Durbin residence about 10 to 15 minutes before the attack. On cross-examination, Fitzsimmons said he only observed the men for a "[m]illisecond," the living room was dark except for the television, and agreed with the prosecutor it was possible he "just assumed they were younger." He claimed to have been shot during the attack, resulting in a bruise below his knee, but agreed with the prosecutor that a photograph showed that the injury was scarcely visible.

Madera Police Corporal Brian Ciapessoni testified that Cindy Durbin had picked Jesse Rangel's photograph out of a lineup as the shorter of the two

8

assailants. On cross-examination, the corporal said Jesse Rangel closely resembled Jesse's cousin, Little Pete, and Cindy was never shown a photograph of defendant. Corporal Ciapessoni also testified that Diaz had a tentative agreement with the district attorney's office at the time he made his January 5, 1996, statement to police that if he fully cooperated and told the truth he would not serve time in custody.

Tino Alvarez denied shooting at Juan Uribe's car. Alvarez told police in late November 1995 that, earlier that month, Diaz had identified the shooters as Jesse Rangel and Juan Ramirez.

Jose Enriquez, defendant's father-in-law, testified by conditional examination because he was ill and his life expectancy was short. (Pen. Code, §§ 1335, 1345.) Enriquez stated that after Little Pete was shot, Enriquez and defendant were conversing outside defendant's house. Jesse Rangel appeared and said, "Don't worry [uncle]. I'm going to take care of everything." He then pulled out a gun.

Christina Bowles, who considered defendant her father, testified that on the afternoon of October 6, 1995, the day before the murders, she saw Richard Diaz and Jesse Rangel together in a Jeep. Bowles was looking for Diaz so that she could "buy a dime of crank" from him as she frequently did. Diaz and Jesse picked her up and, while in the Jeep, she noticed a gun. Diaz explained the gun was to "[g]o get even," and either Diaz or Jesse added with "Juan Uribe." Bowles did not tell law enforcement about this encounter. At one point, she tried to tell investigating Madera Police Officer Benabente, "The ones that are your snitches are the ones that . . . did it," and "they got the wrong people locked up," but he brushed her off. On cross-examination, Bowles was impeached by her recent theft of liquor.

9

## B. Penalty Phase

### 1. *Prosecution evidence*

The prosecution presented victim impact testimony and relied on the circumstances of the crimes.

Martha Melgoza, the girlfriend of victim Juan Uribe and the mother of his young daughter, testified that she had been at Chuck Durbin's house on October 7, 1995. She left before the murders, and later heard about a shooting on East Central Avenue. She rushed back to Durbin's house, but was told by police that Uribe was dead. Her daughter missed Uribe, and believed she saw him "every place we go."

Maria Sanchez Guzman (Sanchez), Juan Uribe's mother, testified that Uribe was her first child. He and his girlfriend Melgoza lived with Sanchez. Uribe had a younger brother and was close to his three sisters. He took responsibility for the family by making sure they were fed and the bills were paid. Sanchez described learning something had happened to Uribe, going to East Central Avenue, and learning from police of his murder. For the first few weeks after his death, Sanchez wanted "to die myself." When Uribe's little sister saw his body at the funeral, she ran out crying and nearly ran into traffic. Shortly after Uribe's murder, the family moved to Tennessee.

Cindy Durbin, Chuck Durbin's wife, recounted the events on the night of the murders. She described telling Chuck that she loved him and did not want him to die. Chuck raised his hands to his head, and tried to talk, but only made noises. Only after responding paramedics told her Chuck was dead did she tell them she also had been shot because Chuck "was hurt worse than I was." Telling their children their father was dead "was the hardest thing" she had ever done. The family received counseling; their daughter Natasha received more than the other

10

children because she witnessed her father's murder. Natasha died from influenza about a year before Cindy's testimony. It was difficult to deal with her death without Chuck. Their son was slightly autistic, had a speech impediment, and for more than a year after Chuck's murder, would hide whenever the doorbell rang at night. He "still says he is looking for Chuck."

Ginger Colwell, Chuck's mother, testified she was close to Chuck and saw him every day. She described Cindy calling on the night of the murders and asking Colwell to pick up the children, seeing police cars when she arrived, and being told Chuck was all right. She took the children to her house. Natasha told Colwell, "[G]randmother, they were calling Juan a traitor." Colwell asked if Chuck said anything. Natasha said he told her to run and hide. Natasha put a pillow over her two siblings, and "pulled the covers up so they wouldn't get hurt." At 4:00 a.m. the next day, Colwell learned from her son Randy of Chuck's death.

Randy Durbin, Chuck Durbin's younger brother by two years and only sibling, testified that their mother was a single parent, and Chuck had therefore been a predominant male figure in Randy's life. Randy described hearing from his mother her concern that Chuck might have been shot, and going to Chuck's house and seeing him alone on the living room floor, but being barred by police from entering. Since Chuck's death, Randy had avoided being close to others because of a fear of losing them.

2. *Defense evidence*

Michael Percy testified he had worked side by side with defendant from 1980 when defendant was hired to work at FMC Corporation (FMC) until 1995. Percy was new in Madera, and defendant was the first person to befriend him. Defendant moved into a leadership role quickly at FMC because of his mechanical aptitude. He helped train other employees and was "[u]pbeat all the time." Percy

11

never observed defendant to have a problem with any employee, and he was professional with customers. Percy described defendant as "one of the most easygoing persons I know." Although Percy could be difficult to work with, defendant had never shown anger.

Jerry Smith testified that he had worked with defendant at FMC for 15 years and that he had supervised him for a number of years. Defendant was a "[r]eal good man" and one of Smith's best friends. Defendant was a leader who was consistently patient and worked well with both mechanics and engineers. He fixed other employees' lawnmowers and chain saws without compensation.

Ronald Edwards testified that he worked with defendant at FMC from 1985 to 1995. For a time they were also neighbors. Edwards described one incident when Edwards was about to fight with a different neighbor and defendant calmed everyone down and told Edwards, "[T]hat's not the right way to handle it."

The week after Little Pete was shot, defendant told Edwards what had happened and said he had talked to Little Pete about "how he is going to have to let this go. And just let bygones be bygones. [Defendant] was afraid something was going to happen to [Little Pete] even worse than what had already happened. He didn't want things to escalate any further."

Joe Rangel testified that he was defendant's youngest brother. Joe was 46 years old and defendant was about 51 years old. When Joe and defendant were children, the family worked in seasonal agriculture and struggled economically. They followed work from state to state, and had lived in Texas, Washington, Utah, and Arizona. When they moved to Madera, their father contracted tuberculosis, and was placed in a sanitarium. Defendant had finished only the eighth grade but dropped out of school without complaint to support the family. This sacrifice allowed Joe and a third brother to graduate from high school. About the time their father was able to work again, defendant joined the Navy. His service influenced

12

Joe to join the Army National Guard after high school. In addition to FMC, defendant had worked for Madera Glass, Bob's Cyclery, and for a crop dusting firm. Once defendant married, he and Joe remained close but had little contact. Their respective families were not close.

Deanna Ramirez, defendant's stepdaughter, testified that defendant was loving and caring, and never referred to her as his stepdaughter but always as his daughter. He took her and her siblings to Magic Mountain and Santa Cruz, camping, the zoo, and to many restaurants and movies. He helped Deanna with her homework and was always involved in school activities. When she was about 26 years old, her biological father, whom she had never known, died. Defendant took her and her sister and mother to his funeral in Mexico. When Deanna's biological family excluded her and her sister at the funeral, defendant told them he loved them and he would always be their dad.

Deanna became pregnant at about 16 years of age, and the child's father left her. Deanna's mother threw her out of the house, but defendant urged her to come home and helped care for Deanna's child so that Deanna could finish high school. Deanna's daughter was now 12 years old and was close to defendant.

A family relative named Yolanda and her friend Roy, both of whom had Down's syndrome, also lived for many years with the family, and defendant treated them like everyone else. When Deanna was 16 years old, her four young cousins came to live with them because their mother had died. Defendant treated them as his children. On cross-examination, Deanna agreed with the prosecutor that defendant received payment apparently from the state for supporting these individuals.

Josephine Reyes testified that she had lived with defendant for about 16 years from the time she was about one year old. Defendant treated her as his daughter. Josephine's biological father disowned her because her complexion was lighter

13

than that of her sister. Defendant told Josephine he would always accept her and that he was there for her.

Angela Marie Chapa testified that although she and Little Pete were not married, she considered defendant her father-in-law. In 1993, when Angela became pregnant, she moved in with defendant and his wife. Defendant was emotionally and financially supportive, and treated Angela like a daughter. He frequently spent time with her daughter Alexis, and he and his wife often socialized with Angela and Little Pete. When Little Pete was shot, defendant cried both that night and the next day. On cross-examination, Angela said Little Pete was only in the hospital for a couple of hours, and did not require surgery but received stitches.

## II. DISCUSSION

### A. Pretrial Issues

#### 1. *Representative cross-section*

Six separate groups of prospective jurors were called to the trial court for jury duty; one panel for each of the morning and afternoon sessions of three consecutive court days. Some prospective jurors were excused on the basis of hardship and the remainder were asked to fill out questionnaires and directed to return on a specified day. The first three groups were instructed to return on one day and the other three groups were instructed to return on the following day. When they returned, some of the prospective jurors were called into the jury box and subjected to individual voir dire.

Defendant contends that, as a result, the prospective jurors were not called into the jury box for individual voir dire by a random process because only prospective jurors from at most the first three panels were called into the jury box for the exercise of peremptory challenges, and a jury had been selected before

14

prospective jurors in the later panels were reached. He further asserts that there were eight Hispanic persons in the panels from which the jury was drawn, but 26 Hispanic prospective jurors in the later panels that were not reached. He contends the jury selection procedure resulted in an underrepresentation of Hispanic prospective jurors in violation of his right to a representative cross-section of the community. We reject the claim.

We have held that, "[t]o establish a prima facie violation of the Sixth Amendment's fair cross-section requirement, defendant would have to demonstrate: (1) the group allegedly excluded was a distinctive group in the community; (2) the representation of that group in the venire from which his jury was selected was not fair and reasonable in relation to the number of such persons in the community; and (3) the underrepresentation was due to systematic exclusion of that group in the jury selection process." (*People v. Rogers* (2006) 39 Cal.4th 826, 858; see *Duren v. Missouri* (1979) 439 U.S. 357, 364.)

Here, defendant does not challenge the composition of the venire. Rather, he challenges the composition of the panels from which the jury was selected. Although the terms are sometimes used interchangeably, we have explained that a " 'venire' is the group of prospective jurors summoned from a larger list of eligible jurors," while a " 'panel' is the group of jurors from the venire assigned to a court for selection of the trial jury." (*People v. Ramos* (1997) 15 Cal.4th 1133, 1152, fn. 1.) "[I]n many cases, particularly lengthy capital prosecutions, several panels are assigned to a courtroom during the selection of the trial jury." (*People v. Bell* (1989) 49 Cal.3d 502, 525.)

Defendant neither objected below to the panels nor moved to quash the venire, and the claim is therefore forfeited on appeal. (*People v. Carrasco* (2014) 59 Cal.4th 924, 957.) But even had defendant preserved the issue, defendant's claim would fail on the merits. Even assuming defendant could satisfy the other

15

prongs of the test, defendant fails to show that any underrepresentation of Hispanics in the panels from which the jury was ultimately selected was due to *systematic* exclusion of that group in the jury selection process, as opposed to the random order in which members of the venire were called to the trial department for selection of the trial jury. (*People v. Seaton* (2001) 26 Cal.4th 598, 638 (*Seaton*) [there was no evidence that the jury selection process systematically excluded any racial or ethnic group when certain prospective jurors were not among those called by the clerk because they were among the last jurors questioned in voir dire].)

Defendant further asserts the challenged jury selection procedure "violated the statutory guarantee of randomness in jury selection." Again, this claim is forfeited because defendant never raised it below. The claim fails on the merits in any event. Defendant observes that Code of Civil Procedure section 222, subdivisions (a) and (b), provide that unless "the jury commissioner has provided the court with a listing of the trial jury panel in random order," "the clerk shall randomly select the names of the jurors for voir dire, until the jury is selected or the panel is exhausted." Defendant claims "the statutory . . . guarantee of randomness is defeated when multiple . . . panels are called for trial of a capital case," but he does not explain how this is so, nor is any reason apparent. Nor does defendant identify any statutory provision that required the trial court to conduct voir dire randomly from the *combined* group of all six panels.

2. *Defense challenges for cause*

Defendant contends the trial court erred in denying his challenge for cause to Juror No. 1, who sat on his jury. Defendant had challenged Juror No. 1 after she responded on voir dire that she did not think she would consider a sentence of life imprisonment if defendant was "found guilty of at least one count of willful,

16

deliberate, and premeditated murder." Juror No. 1 was then questioned by the prosecutor and the court and affirmed that she could listen to mitigating and aggravating evidence and then weigh that evidence before deciding what penalty to impose. The court then denied the challenge. Defendant's claim is forfeited because defendant did not use an available peremptory challenge to remove Juror No. 1. " ' "As a general rule, a party may not complain on appeal of an allegedly erroneous denial of a challenge for cause because the party need not tolerate having the prospective juror serve on the jury; a litigant retains the power to remove the juror by exercising a peremptory challenge. Thus, to preserve this claim for appeal we require . . . that a litigant actually exercise a peremptory challenge and remove the prospective juror in question." ' " (*People v. Nunez and Satele* (2013) 57 Cal.4th 1, 26 (*Nunez and Satele*); see generally *People v. Mills* (2010) 48 Cal.4th 158, 186.) Defendant "failed to do so, and cannot now complain about the trial court's asserted error." (*Nunez and Satele*, at p. 26.)

### 3. *Retention of Jurors No. 9 and No. 12*

After jury selection and before opening statements, Jurors No. 9 and No. 12 came forward regarding their relationships with potential trial witnesses. Defendant contends that the trial court erred in failing to discharge these jurors. We disagree.

#### a. *Juror No. 9*

After the jury was sworn and before opening statements, Juror No. 9 contacted the trial court and said she was acquainted with Randy Durbin, who, counsel explained, was the brother of victim Chuck Durbin. In a hearing outside the presence of the jury, Juror No. 9 said that about four years earlier, Randy Durbin had, on occasion, apparently been her substitute water aerobics instructor at the Madera Athletic Club. The juror's husband was currently taking a class

17

taught by Randy Durbin at Madera College, and Juror No. 9 had "attended a few of the classes." The court asked whether "[a]nything about that would have any effect on your ability to be fair and impartial to both sides in this case?" She replied, "No, I don't think so. I just wanted everybody to be aware of that."

Defense counsel noted that Randy Durbin might be a witness at the penalty phase, and asked Juror No. 9 if she was aware Randy and victim Chuck Durbin were brothers. She replied, "Right." Counsel asked, "When it comes down to the penalty phase, the fact that you have had a past and what appears to be [an] ongoing relationship with Randy Durbin, do you feel that that would affect you in any way in the penalty phase?" Juror No. 9 replied: "No, I don't think so. We are not personal friends or anything. And I am not going to go to class anymore because of that. So nothing comes of it." Neither counsel had any further questions.

Defendant then moved to reopen jury selection, use a peremptory challenge on Juror No. 9, and have her replaced by an alternate. Defense counsel said that on voir dire it had been "a very close question whether we were going to use a peremptory challenge" because of Juror No. 9's "background and many of her family members being in the correctional area." Defense counsel said: "I am not saying [Juror No. 9] intentionally kept from us this information" because "if that were the case, she wouldn't have told us now. However, it seems rather incredible to me given her relationship with Randy, that it didn't come out during voir dire. And there was every opportunity for it to come out."

The court ruled that Juror No. 9 could not be removed unless she was "disqualif[ied]," and there was no basis for doing so. The court stated: "She is not personal friends with this Randy Durbin. Apparently he went to the same gym she did four years ago. And apparently this Randy Durbin teaches her husband. And she had gone to class a couple of times with him. There's no relationship there

18

whatsoever. . . . And she has indicated it would have no effect." Defendant then "challenged" Juror No. 9 for cause, in essence moving to discharge her for cause, asserting there was no reason for Juror No. 9 not to have brought up the issue on voir dire. The court denied the challenge, stating: "Well, she certainly didn't intentionally mislead counsel, [or] the court in voir dire. This person was not somebody that she is so well acquainted with she would necessarily recall that she knew who he was. And there's no evidence of any personal relationship . . . . So I see no bias or prejudice. She seems to be forthright in bringing that to our attention." The court stated that its ruling was "without prejudice to renewing your motion upon looking further into her background or upon" legal research.[5] Defendant did not renew the motion. Randy Durbin testified at the penalty phase.

Penal Code section 1089 " 'authorizes the trial court to discharge a juror at any time before or after the final submission of the case to the jury if, upon good cause, the juror is "found to be unable to perform his or her duty." ' " (*Nunez and Satele*, *supra*, 57 Cal.4th at p. 55.) " '[W]hen a trial court's denial of a motion to discharge a juror is supported by substantial evidence, it will be upheld.' " (*People v. Maciel* (2013) 57 Cal.4th 482, 543 (*Maciel*).)

Substantial evidence supports the trial court's ruling here. The court, which was in a position to observe Juror No. 9's demeanor, found no evidence of disqualifying bias. Nor does anything in Juror No. 9's conduct — contacting the court right after voir dire and before opening statements to mention she knew Randy Durbin — or her subsequent voir dire statements reveal actual bias. (See *Maciel*, *supra*, 57 Cal.4th at pp. 543-544 [upholding denial of motion to discharge

---

[5] The trial court actually said that its ruling was "not without prejudice to renewing [the] motion," but in context it is apparent the court meant "without prejudice to renewing [the] motion."

19

juror who worked at the same jail as two anticipated penalty phase witnesses, where the trial court found the juror appeared to be honest based on his answers and demeanor and there was no evidence he had prejudged any issue]; *People v. McPeters* (1992) 2 Cal.4th 1148, 1174-1175 [upholding denial of motion to remove juror where trial court found juror's nondisclosure inadvertent and no bias on his part].)

### b. *Juror No. 12*

Juror No. 12 said she had known a Ginger Colwell, who, counsel explained, was the mother of victim Chuck Durbin. Juror No. 12 said her sister-in-law's brother had married "this Ginger Colwell," and that Juror No. 12 had not spoken to her in at least 15 years. The trial court asked, "So the fact that she may testify in this case would not have any effect on your ability to fairly decide the case?" Juror No. 12 replied, "No." The court invited inquiry and both parties replied, "No questions."

Defendant did not move for discharge of Juror No. 12. The claim is therefore forfeited on appeal. (See *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 47-48 [failure to challenge for cause purportedly biased jurors "forfeit[s] any appellate claim of error in the seating of those jurors"].) In any event, defendant merely mentions Juror No. 12's statements concerning her prior relationship to Ginger Colwell, without making any attempt to explain how her statements demonstrate disqualifying bias. No such bias is apparent from the record.

### B. Guilt Phase Issues

#### 1. *Sufficiency of the evidence*

Defendant contends that there is no substantial evidence he premeditated Chuck Durbin's murder and, therefore, his conviction must be reduced from first

20

degree to second degree murder. He further contends no substantial evidence supports the jury's finding that he personally used a gun in Juan Uribe's murder.

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Edwards* (2013) 57 Cal.4th 658, 715 (*Edwards*).)

### a. *Durbin murder*

Substantial evidence supports the jury's finding that defendant premeditated Durbin's murder. The evidence demonstrated defendant and his son armed themselves and went in search of Uribe to kill him. They located Uribe at Durbin's house. Defendant could see from outside Durbin's house that several people were inside, yet defendant continued with his plan to kill Uribe. The jury could reasonably conclude from this evidence that defendant not only premeditated Uribe's death but also the death of anyone inside the house who interfered with that plan. (See *People v. San Nicolas* (2004) 34 Cal.4th 614, 657-659 (*San Nicolas*) [substantial evidence of premeditation when the defendant saw the second victim's reflection in a mirror and turned around and stabbed her, perhaps to eliminate her as a witness to the first murder]; *People v. Bolin* (1998) 18 Cal.4th 297, 331-333 (*Bolin*) [although one of the murder victims was a

21

stranger to the defendant, the defendant may have been motivated to eliminate witnesses to the first victim's murder and to protect his marijuana crop from theft or exposure to law enforcement].) Moreover, Durbin's head and neck wounds were consistent with bullets fired from defendant's gun, and this manner of killing further supports a finding of deliberation.[6] (*San Nicolas*, at pp. 658-659; *Bolin*, at p. 332.)

### b. Firearm use

Defendant contends there is no substantial evidence he personally used a firearm in the death of Juan Uribe. The jury, however, found not true the allegation that defendant personally used a firearm to kill Uribe.

### 2. Admission of hearsay statements

Defendant contends that admitting hearsay statements by Little Pete and Mary Rangel violated his rights under the confrontation clause of the Sixth Amendment to the federal Constitution. (*Crawford v. Washington* (2004) 541 U.S. 36, 59-60, 68 (*Crawford*).) We disagree.

As noted above, Jesse Rangel testified that Little Pete telephoned him twice on the night of the murders and made incriminating statements, and made further incriminating statements to him in person during their visit to Frank Sr.'s house in Fresno. Erica Rangel, Jesse's wife, testified to statements Mary Rangel made to defendant. (See *ante*, at pp. 5-7.) Over defendant's objection, the trial court admitted Little Pete's statements as statements against interest and Mary Rangel's statements as adoptive admissions. (Evid. Code, §§ 1221, 1230.)

---

[6] Defendant asserts the jury found not true the personal use of a firearm allegation for Durbin's murder, and contends this demonstrates the jury found the evidence of murder lacking. The jury in fact found the personal use allegation true.

22

Defendant claims that admitting Little Pete's and Mary Rangel's statements violated his Sixth Amendment right to confront the witnesses against him. In *Crawford*, *supra*, 541 U.S. 36, the United States Supreme Court overruled *Ohio v. Roberts* (1980) 448 U.S. 56, 66 (*Roberts*), which had held that the confrontation right does not bar admission of the out-of-court statements of an unavailable witness if the statements "bear[] adequate 'indicia of reliability.' " Rejecting this approach, *Crawford* held that, in general, admission of "testimonial" statements of a witness who was not subject to cross-examination at trial violates a defendant's Sixth Amendment right of confrontation, unless the witness is unavailable and the defendant had a prior opportunity for cross-examination. (*Crawford*, at pp. 59-60, 68.) Although the court in *Crawford* "did not offer an exhaustive definition of 'testimonial' statements," the court has since clarified that "a statement cannot fall within the Confrontation Clause unless its primary purpose was testimonial" (*Ohio v. Clark* (2015) 576 U.S. ___, ___-___ [135 S.Ct. 2173, 2179-2180]) — that is to say, unless the statements are given in the course of an interrogation or other conversation whose " 'primary purpose . . . is to establish or prove past events potentially relevant to later criminal prosecution.' " (*Id.* at p. 2180, quoting *Davis v. Washington* (2006) 547 U.S. 813, 822; see *Ohio v. Clark*, at pp. 2180-2181 [noting that "the primary purpose test is a necessary, but not always sufficient, condition for the exclusion of out-of-court statements under the Confrontation Clause"].) Under this test, "[s]tatements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers." (*Id.* at p. 2182.) The court in *Ohio v. Clark*, however, "decline[d] to adopt a rule that statements to individuals who are not law enforcement officers are categorically outside the Sixth Amendment." (*Ibid.*) A court also considers the formality " 'of the situation and the interrogation' " in determining the primary purpose of a

challenged statement. (*Id*. at p. 2180.) "In the end, the question is whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.' " (*Ibid*.; see *id.* at p. 2183.)

### a. Forfeiture

The Attorney General asserts that defendant has forfeited his confrontation clause challenge to Mary Rangel's statements because he failed to object on this ground at his 1998 trial. In 1998, governing law in California held that admission of a hearsay statement as an adoptive admission did not implicate the defendant's Sixth Amendment confrontation right. (*People v. Silva* (1988) 45 Cal.3d 604, 624 (*Silva*); *People v. Preston* (1973) 9 Cal.3d 308, 315-316 (*Preston*).) This court had stated: "[B]y reason of the adoptive admissions rule, once the defendant has expressly or impliedly adopted the statements of another, the statements become *his own admissions*, and are admissible on that basis as a well-recognized exception to the hearsay rule. (See *Ohio v. Roberts* (1980) 448 U.S. 56, 65-66.) Being deemed the defendant's own admissions, we are no longer concerned with the veracity or credibility of the original declarant. Accordingly, no confrontation right is impinged when those statements are admitted as adoptive admissions without providing for cross-examination of the declarant."[7] (*Silva*, at p. 624.)

In light of *Silva* and *Preston*, defendant's failure to object on confrontation clause grounds during his 1998 trial " 'was excusable, since governing law at the

---

[7]     As defendant notes, even after *Crawford*, *supra*, 541 U.S. 36, this court has at times applied a similar analysis to hold that admission of a hearsay statement as an adoptive admission does not implicate a defendant's Sixth Amendment confrontation right. (See, e.g., *People v. Jennings* (2010) 50 Cal.4th 616, 660-662; *People v. Combs* (2004) 34 Cal.4th 821, 842.) We need not consider this issue here because Mary Rangel's statements were not testimonial in any event.

time . . . afforded scant grounds for objection.' [Citation.] ' "[W]e have excused a failure to object where to require defense counsel to raise an objection 'would place an unreasonable burden on defendants to anticipate unforeseen changes in the law and encourage fruitless objections in other situations where defendants might hope that an established rule of evidence would be changed on appeal.' " ' [Citation.]" (*Edwards*, *supra*, 57 Cal.4th at p. 705.) Defendant's argument is based on the United States Supreme Court's decision in *Crawford*, which was not issued until well after his trial concluded. As the United States Supreme Court has observed, the "*Crawford* rule is flatly inconsistent with the prior governing precedent, *Roberts*, which *Crawford* overruled." (*Whorton v. Bockting* (2007) 549 U.S. 406, 416.) We therefore conclude that in a case tried before *Crawford*, a defendant does not forfeit a *Crawford* challenge by failing to raise a confrontation clause objection at trial. (See *People v. Chism* (2014) 58 Cal.4th 1266, 1287-1288, fn. 8 ["[B]ecause defendant's counsel could not have anticipated *Crawford*'s sweeping changes to federal confrontation clause case law, he did not forfeit this claim by failing to object to the admission of [the] statements on federal constitutional grounds," but instead raising only a hearsay challenge.]; accord, *People v. Kopatz* (2015) 61 Cal.4th 62, 88; see *People v. Pearson* (2013) 56 Cal.4th 393, 462 [*Crawford* "represents an unforeseen change in the law 'that competent and knowledgeable counsel reasonably could [not] have been expected to have anticipated' at defendant's [pre-*Crawford*] trial, and excuse[s] his failure to object."].)[8]

---

[8] As to other claims in which defendant alleges for the first time that the error complained of violated his federal constitutional rights, the new claims are not forfeited to the extent that in doing so defendant has "raised only a new constitutional 'gloss' on claims preserved below. . . . However, '[n]o separate constitutional discussion is required, or provided, when rejection of a claim on the

*(footnote continued on next page)*

We acknowledge that our approach to this issue has not been entirely consistent.  (See, e.g., *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1214 [defendant forfeited *Crawford* challenge in case tried before *Crawford* by failing to object on confrontation grounds, but *Crawford* challenge lacked merit in any event]; *People v. Lopez* (2013) 56 Cal.4th 1028, 1065 [same]; *People v. Riccardi* (2012) 54 Cal.4th 758, 801, fn. 21 [same]; *Riccardi*, at pp. 826-827, fn. 33 [same]; *People v. Dement* (2011) 53 Cal.4th 1, 22-23 (*Dement*) [same].)  To the extent these cases suggest that counsel may be faulted for failing to object on *Crawford* grounds in a case tried before *Crawford* was decided, we now expressly reject any such suggestion.

We also clarify that the relevant inquiry is not, as some of our cases might be read to suggest, whether the defendant's *Crawford* challenge relies on the same facts and legal standards as a challenge made on hearsay or other state law grounds.  (See *People v. Gutierrez* (2009) 45 Cal.4th 789, 809, 812 [confrontation clause claim not forfeited on appeal when only a hearsay objection was asserted below, either because the new argument does not invoke facts or legal standards different from those the trial court was asked to apply or the appellate claim "is the kind that required no trial court action to preserve it"]; see also, e.g., *People v. Loy* (2011) 52 Cal.4th 46, 66 [citing *People v. Gutierrez* for the proposition that a defendant may raise a confrontation clause challenge on appeal "to the extent he argues that the erroneous overruling of the objection actually made also had the consequence of violating his federal constitutional rights"].)  A *Crawford*

---

*(footnote continued from previous page)*

merits necessarily leads to rejection of [the] constitutional theory . . . .' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 364 (*Bryant, Smith and Wheeler*).)

objection generally requires a court to consider whether statements are testimonial, and, if so, whether a witness was unavailable and the defendant had a prior opportunity for cross-examination. This invokes different legal standards than, for example, a hearsay objection, which generally requires a court to consider whether the foundational requirements for admission of particular hearsay have been satisfied. (See *People v. Redd* (2010) 48 Cal.4th 691, 730, fn. 19 [objection that asserted hearsay exception lacked foundation "presented legal issues different from those underlying an objection that the admission of testimony would violate the confrontation clause"].) For present purposes, however, the relevant question is whether requiring defense counsel to raise an objection " ' " would place an unreasonable burden on defendants to anticipate unforeseen changes in the law." ' " (*Edwards*, *supra*, 57 Cal.4th at p. 705.) Because that standard is satisfied here, we conclude that defendant has not forfeited his *Crawford* claim.

### b. Merits

Turning to the merits of defendant's confrontation clause claim, we conclude the statements by Little Pete and Mary Rangel were not made to law enforcement officers, nor were they otherwise made under circumstances suggesting a primary purpose of creating evidence for defendant's prosecution. The statements therefore were not testimonial. (Cf. *Ohio v. Clark*, *supra*, 576 U.S. at p. ___ [135 S.Ct. at p. 2181] [three-year-old's statements to his preschool teachers not testimonial because they "clearly were not made with the primary purpose of creating evidence for [the defendant's] prosecution"].) Thus their admission did not violate defendant's rights under the confrontation clause.

Defendant further contends that, even if the statements were nontestimonial, they were unreliable under *Ohio v. Roberts*, *supra*, 448 U.S. 56, and for that reason should have been excluded under the confrontation clause. Defendant's argument rests on a misapprehension of the confrontation guarantee as elaborated

27

in *Crawford*. The court in *Crawford* explained that while "the Clause's ultimate goal is to ensure reliability of evidence, . . . it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner" — that is, by ensuring that testimonial hearsay be "test[ed] in the crucible of cross-examination." (*Crawford*, *supra*, 541 U.S. at p. 61.) As the court has since affirmed, "[i]t is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, *is not subject to the Confrontation Clause*." (*Davis v. Washington*, *supra*, 547 U.S. at p. 821, italics added.) Thus, "the court has made clear that *Roberts*, *supra*, 448 U.S. 56, and its progeny are overruled for all purposes, and retain no relevance to a determination whether a particular hearsay statement is admissible under the confrontation clause." (*People v. Cage* (2007) 40 Cal.4th 965, 981, fn. 10.)

Defendant further argues that admission of Mary Rangel's out-of-court statement violated his right to confront the witnesses against him because his silence did not manifest his adoption or belief in the truth of his wife's statement. He argues that he "was not in a position to protest since anything he said would seem to be an accusation of his own son and moreover would be guaranteed to launch a further domestic quarrel with his wife." Whether defendant's silence manifested his adoption or belief in the truth of his wife's accusation was an issue of fact for the jury to determine. The trial court did not err in admitting the evidence.

For the first time in his reply brief, defendant asserts that Little Pete's statements to Jesse Rangel should be considered testimonial because "Jesse was recruited as a police agent" in New Mexico. Defendant explains that Jesse gave a statement to police in New Mexico and was flown back to Madera at county expense. This claim is forfeited. "Obvious reasons of fairness militate against

28

consideration of an issue raised initially in the reply brief." (*Varjabedian v. City of Madera* (1977) 20 Cal.3d 285, 295, fn. 11.)  The claim also lacks merit.  Even if these facts were sufficient to demonstrate that Jesse was a police agent, Jesse went to New Mexico *after* defendant and Little Pete made their incriminating statements to him.  Whatever Jesse's motives may have been in later describing those conversations to law enforcement officials, defendant identifies no reason to think that Little Pete made the statements in question in the course of a conversation whose primary purpose was to create evidence for defendant's later prosecution.

Defendant also contends for the first time in his reply brief that the trial court erred under Evidence Code section 1230[9] in admitting Little Pete's statements to Jesse Rangel because Jesse had a motive to lie and his accurate testimony concerning the details of the crime could be explained by his own involvement.  Defendant conceded below that Little Pete's statements were statements against penal interest, but claimed they were insufficiently reliable to be admissible under Evidence Code section 1230.

Again, "[i]t is axiomatic that arguments made for the first time in a reply brief will not be entertained because of the unfairness to the other party." (*People v. Tully* (2012) 54 Cal.4th 952, 1075.)  In any event, the argument lacks merit.  Here, defendant simply challenges Jesse Rangel's trustworthiness.  We have previously rejected the argument that "in considering the admissibility of evidence

---

[9]  Evidence Code section 1230 provides in relevant part:  "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of . . . criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true."

offered under" Evidence Code section 1230 "the trial court could properly consider the credibility of the in-court witness," and observed that "[n]either the hearsay rule nor its exceptions are concerned with the credibility of witnesses who testify directly to the jury." (*People v. Cudjo* (1993) 6 Cal.4th 585, 608 (*Cudjo*).)

### 3. *Asserted prosecutorial misconduct*

Defendant contends that the prosecutor committed several acts of misconduct during closing argument. We disagree.

"A prosecutor commits misconduct when his or her conduct either infects the trial with such unfairness as to render the subsequent conviction a denial of due process, or involves deceptive or reprehensible methods employed to persuade the trier of fact." (*People v. Avila* (2009) 46 Cal.4th 680, 711 (*Avila*).) "As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841 (*Samayoa*).) "When attacking the prosecutor's remarks to the jury, the defendant must show" that in the context of the whole argument and the instructions there was " 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 667.)

### a. *Premeditation*

Defendant asserts that the prosecutor committed misconduct by arguing that premeditation was demonstrated merely by evidence of an intent to kill. Defendant did not object to the prosecutor's argument or seek an admonition, and no exception to the general rule requiring an objection and request for admonition applies. The claim is therefore forfeited. (*Samayoa*, *supra*, 15 Cal.4th at p. 841.)

30

The claim is also meritless. The prosecutor said: "And then the final [element] is the willful, deliberate, and premeditation that's required in first degree murder. And with respect to willful, deliberate, and premeditated does that mean there has to be a certain amount of planning ahead of time? They get together and they draw diagrams and everything? No. It does not mean that at all. It means that the intent to kill, that the killing was accompanied by clear and deliberate intent to kill. That this intent to kill was formed upon preexisting reflection and that the slayer must have weighed and considered the question of killing, the reasons for and against killing, and having in mind the consequences of killing, he chooses to kill and he does kill. And does this mean that there's a duration of time that's required? No. . . . [T]he law does not require any specific duration of time for willful, deliberate, and premeditated murder. The true test is not the duration of the time, but the extent of the reflection. A cold and calculated judgment can be arrived at in a short period of time."

The prosecutor correctly described premeditation (*Bolin*, *supra*, 18 Cal.4th at pp. 331-332), and did not argue that premeditation was established merely by evidence of intent to kill, or otherwise "effectively omit[] the premeditation element of first degree murder." No misconduct is demonstrated.

### b. *Implied malice*

Defendant contends that the prosecutor committed prejudicial misconduct by arguing that implied malice murder required an intent to kill. He contends that, by "rais[ing] the bar for conviction of implied malice second degree murder, a lesser included offense to [first degree murder]," the prosecution's argument "made conviction of premeditated first degree murder more likely." We disagree.

Defendant did not object to the prosecutor's argument or seek an admonition, and no exception to the general rule requiring an objection and request for

31

admonition applies. The claim is therefore forfeited. (*Samayoa*, *supra*, 15 Cal.4th at p. 841.) The claim of error also lacks merit. Murder is "the unlawful killing of a human being . . . with malice aforethought." (Pen. Code, § 187, subd. (a).) Malice "may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (Pen. Code, § 188.) " 'We have interpreted implied malice as having "both a physical and a mental component. The physical component is satisfied by the performance of 'an act, the natural consequences of which are dangerous to life.' [Citation.] The mental component is the requirement that the defendant 'knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life.' [Citation.]" [Citation.]' " (*People v. Bryant* (2013) 56 Cal.4th 959, 965.)

Here, the prosecutor said: "Now, you are going to be instructed on a lesser included [offense] with respect to first degree murder and that [is] second degree murder. And second degree murder is an unlawful killing of a human being with malice aforethought. No premeditation or deliberation is required. But malice aforethought means two different things when it comes to second degree murder. It can either be express malice aforethought or the express intent to kill that I referred to earlier or it can be implied. The law will in certain cases imply an intent to kill. And the judge will instruct you that it's going to be implied when the killing resulted from an intentional act, the natural consequences of that act were dangerous to human life. And the act was deliberately performed with knowledge of the danger, and with the conscious disregard for human life. So even if you were not to find an intent to kill, an express intent to kill, the actions of the defendant and his son in that house definitely were intentional. They knew the consequences of a danger, that danger to human life. They had knowledge of the

32

danger and the conscious disregard for human life at the time they committed those acts. The law is going to imply an intent to kill in that case, second degree murder. You just have to have an unlawful killing and either express or implied intent to kill. And you don't need premeditation and deliberation. . . . But you would only find . . . second degree murder if you find the defendant not guilty of first degree murder."

The prosecutor did not say that implied malice murder required an intent to kill, but that the law would "imply an intent to kill" under certain circumstances. Although neither Penal Code section 188 nor our cases define implied malice as an implied intent to kill, the prosecutor's statement as a whole correctly described the elements of implied malice murder. Moreover, the trial court properly instructed the jury on implied malice murder. Thus, even if the prosecutor had misstated the elements of second degree implied malice murder, there is no reasonable likelihood that any such misstatement would have affected the jury's consideration of either that charge or the charge of premeditated first degree murder.[10]

### c. Corroboration

The trial court instructed the jury that Richard Diaz was an accomplice as a matter of law and his testimony was subject to the rule requiring corroboration. (Pen. Code, § 1111 ["A conviction can not be had upon the testimony of an

---

[10] The court instructed the jury: "Murder of the second degree is also the unlawful killing of a human being when: One, the killing resulted from an intentional act. Two, the natural consequences of the act are dangerous to human life. And three, the act was deliberately performed with knowledge of the danger to, and with conscious disregard for human life. When the killing is the direct result of such an act, it is not necessary to prove that the defendant intended that the act would result in the death of a human being."

33

accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense . . . ."].)  Defendant contends the prosecutor committed misconduct by arguing that Diaz's testimony was corroborated by the testimony of Jesse Rangel.  We disagree.  Defendant did not object to the prosecutor's argument or seek an admonition, and no exception to the general rule requiring an objection and admonition request applies.  The claim is therefore forfeited.  (*Samayoa*, *supra*, 15 Cal.4th at p. 841.)

The claim is also meritless.  Defendant contends the prosecutor's statement was misconduct because there was substantial evidence that Jesse Rangel was a "possible accomplice," and this "status . . . should have nullified any use of his testimony to corroborate the testimony of Richard Diaz."

Defendant is correct that the testimony of one accomplice cannot corroborate that of another accomplice.  (See *People v. Fauber* (1992) 2 Cal.4th 792, 834.) " 'Whether someone is an accomplice is ordinarily a question of fact for the jury; only if there is no reasonable dispute as to the facts or the inferences to be drawn from the facts may a trial court instruct a jury that a witness is an accomplice as a matter of law.' " (*Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at p. 430.)  When a person is not an accomplice as a matter of law, a defendant has the burden of proving by a preponderance of the evidence that a witness was an accomplice in the crime charged against the defendant.  (*Id*. at p. 429; *People v. Frye* (1998) 18 Cal.4th 894, 967-969; *People v. Tewksbury* (1976) 15 Cal.3d 953, 967-968.)  This principle is reflected in the language of CALJIC No. 3.19.

Here, the trial court offered to instruct the jury in the language of CALJIC No. 3.19 to determine whether Jesse Rangel was an accomplice.  Defendant objected and the instruction was removed.  Defense counsel said it would confuse the jury to instruct it to decide if Jesse Rangel and Juan Ramirez were accomplices when it also was instructed that Richard Diaz was an accomplice as a matter of

law.  Counsel objected to having the jury determine whether Jesse Rangel was an accomplice "because . . . we will be saying that Jesse Rangel and Juan Ramirez may have been the ones that actually committed this act."  Counsel added, "for any court reviewing our decision," it was "not that we don't want those.  We believe it changes the burden in viewing their testimony and puts the burden on us to prove something to the jury which we don't otherwise have to prove.  We just have to raise reasonable doubt by our argument concerning Jesse Rangel and Juan Ramirez."

Thus, rather than "prove something," which apparently referred to defendant's burden of proving by a preponderance of the evidence that Jesse Rangel was an accomplice, defendant elected not to have the jury instructed in the language of CALJIC No. 3.19.  By so doing, he waived his opportunity for the jury to decide whether Jesse was an accomplice, and cannot now claim the benefit of accomplice corroboration rules.  Rather, under these circumstances, nothing precluded the jury from relying on Jesse Rangel's testimony to corroborate that of Diaz, nor can the prosecutor be faulted for urging the jury to so rely.  (See generally *People v. Romero and Self* (2015) 62 Cal.4th 1, 32-33.)

### 4.  *Asserted instructional error*

#### a.  *Flight*

The trial court instructed the jury in the language of CALJIC No. 2.52:  "The flight of a person immediately after the commission of a crime, or after he is accused of a crime, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding whether a defendant is guilty or not guilty.  The weight to which this circumstance is entitled is a matter for you to decide."  (See Pen. Code, § 1127c.)  Defendant asserts that this instruction was erroneous because the trial court did not

35

also instruct sua sponte on evidence of flight by third party suspects Richard Diaz and Jesse Rangel. He claims the instruction is "unbalanced on this record," and "resulted in an unconstitutional shift in the burden of proof." We reject the claim.

The flight instruction was correct, and defendant's failure to propose any modification to the instruction forfeits the claim of instructional error. (*People v. Capistrano* (2014) 59 Cal.4th 830, 875.)

The claim also lacks merit. Even if we assume for purposes of argument that the standard flight instruction does not include flight by third persons, the trial court had no sua sponte duty to modify the instruction to expressly include third party flight.

" 'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence.' " (*People v. Najera* (2008) 43 Cal.4th 1132, 1136 (*Najera*).) These general principles of law are those "vital to the jury's consideration of the evidence" before it. (*Id*. at p. 1137.) We previously have concluded that when "an instruction simply informs the jury that a fact or cluster of facts is not, without more, substantial evidence of guilt under the ordinary legal rules set forth elsewhere in the instructions," there is no "duty on trial courts to provide such an instruction sua sponte." (*Id*. at p. 1139.) Thus, instructions as to consciousness of guilt, motive, possession of recently stolen property, and evidence of other sexual offenses or domestic violence, "while helpful in various circumstances, are not vital to the jury's ability to analyze the evidence and therefore are not instructions that must be given to the jury even in the absence of a request." (*Id*. at pp. 1138-1139, and cases cited.)

Although a trial court is required by statute to instruct on flight when the prosecution relies on evidence of flight by a defendant as tending to show guilt (Pen. Code, § 1127c), there is no similar statutory requirement to instruct when the

36

defense relies on flight by third parties.  Nor does third party flight "qualif[y] as a general principle of law vital to the jury's consideration of the evidence" such that the jury must be instructed on it even in the absence of a request.[11]  (*Najera*, *supra*, 43 Cal.4th at p. 1137.)  Moreover, "[t]he logic of the inference" that such flight could also indicate consciousness of guilt on the part of third parties would have been "plain" to jurors, even in the absence of instruction to that effect.  (*People v. Hartsch* (2010) 49 Cal.4th 472, 503.)  In addition, "the reasonable doubt instructions give defendants ample opportunity to impress upon the jury that evidence of another party's liability must be considered in weighing whether the prosecution has met its burden of proof."  (*Id*. at p. 504.)  Here, counsel in his closing argument did not call attention to flight by either Richard Diaz or Jesse Rangel, indicating any such flight was not central to the defense theory of the case.

The trial court must instruct sua sponte as to defenses " ' "that the defendant is relying on . . . or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." ' "  (*San Nicolas*, *supra*, 34 Cal.4th at p. 669.)  Third party flight, however, is not a defense.  Rather such flight " 'is proffered in an attempt to raise a doubt on an element of a crime which the prosecution must prove beyond a reasonable doubt.' "  (*Ibid.*)  As such, the burden falls on the defendant to request the instruction.  (*Ibid.*)

### b.  *Manslaughter*

Defendant contends the trial court erroneously failed to instruct sua sponte on voluntary and involuntary manslaughter.  We reject the claim.

---

[11]    We are not presented with the issue of whether a defendant is entitled to a requested instruction on third party flight and express no view on it.

The trial court instructed the jury on first and second degree murder. "A trial court has a sua sponte obligation to instruct the jury on any uncharged offense that is lesser than, and included in, a greater charged offense, but only if there is substantial evidence supporting a jury determination that the defendant was in fact guilty only of the lesser offense." (*People v. Parson* (2008) 44 Cal.4th 332, 348-349.) No substantial evidence was presented here that warranted instruction on voluntary or involuntary manslaughter.

### (1) Voluntary manslaughter

#### (i) Provocation

" 'Manslaughter, an unlawful killing without malice, is a lesser included offense of murder.' [Citations.] 'Although [Penal Code] section 192, subdivision (a), refers to "sudden quarrel or heat of passion," the factor which distinguishes the "heat of passion" form of voluntary manslaughter from murder is provocation.' " (*Avila*, *supra*, 46 Cal.4th at p. 705.) "To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection. . . . [T]he anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene." (*People v. Beltran* (2013) 56 Cal.4th 935, 949 (*Beltran*).) " ' "[I]f sufficient time has elapsed for the passions of an ordinarily reasonable person to cool, the killing is murder, not manslaughter." ' " (*Avila*, at p. 705.)

Here, there is no substantial evidence of provocation. Two weeks had elapsed between the time Little Pete was grazed by a bullet and the murders. This was sufficient time for " ' "passion to subside and reason to return." ' " (*People v. Moye* (2009) 47 Cal.4th 537, 550.) On the night of the murders, defendant armed himself, drove around with others looking for Uribe's car and, the jury could

38

reasonably infer, recruited others to help, including arranging for Avila to pick them up after the attack. "These circumstances reveal a concerted effort to plan and execute a surprise attack," not rash action. (*People v. Souza* (2012) 54 Cal.4th 90, 115 [no substantial evidence of provocation when the defendant and codefendant drove their mother, who claimed she had been attacked, around in an unsuccessful effort to find the purported attacker's house, took their mother home and, after she went to bed, armed themselves, recruited help from another, waited outside the purported attacker's house, and obscured their faces with bandanas].) Although defendant notes there was evidence that after Little Pete was shot, Jesse Rangel and Tino Alvarez shot at Uribe's empty car, and that when Uribe later accused Diaz of this shooting, Uribe's friend hit Diaz, there was no evidence defendant knew of these events or that they would cause him to react in a manner that "eclipse[d] reflection." (*Beltran*, *supra*, 56 Cal.4th at p. 950.)

Moreover, although defendant also notes without elaboration that there was evidence he had been drinking on the night of the murders, the test whether provocation is adequate is whether "an average, sober person would be so inflamed that he or she would lose reason and judgment." (*People v. Lee* (1999) 20 Cal.4th 47, 60.) Nor does voluntary intoxication "negate express malice so as to reduce a murder to voluntary manslaughter." (*People v. Saille* (1991) 54 Cal.3d 1103, 1117.)

### (ii) Imperfect self-defense

Defendant asserts the trial court was required to instruct sua sponte on imperfect self-defense because there was evidence Durbin rushed into the living room and defendant thought he was "running to get a gun." No substantial evidence supported such instruction.

39

" ' "Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant *actually*, but unreasonably, believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter." [Citation.]' " (*People v. Manriquez* (2005) 37 Cal.4th 547, 581.)  This doctrine may not, however, be invoked "by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified. . . . For example, the imperfect self-defense doctrine would not permit a fleeing felon who shoots a pursuing police officer to escape a murder conviction even if the felon killed his pursuer with an actual belief in the need for self-defense." (*In re Christian S*. (1994) 7 Cal.4th 768, 773, fn. 1.)

Here, defendant and his son, who were armed, broke into Durbin's home while Durbin and his wife and young children were present.  Defendant shot Durbin when he rushed into the living room because defendant thought he was "running to get a gun."  As defendant appears to concede in his reply brief, because defendant was "the initial aggressor and the victim's response legally justified, defendant could not rely on unreasonable self-defense as a ground for voluntary manslaughter." (*Seaton*, *supra*, 26 Cal.4th at p. 664; see Pen. Code, § 198.5 [resident "presumed to have held a reasonable fear of imminent peril of death or great bodily injury" to himself, his family, or a member of the household when he uses force against a person not a member of the family or household "who unlawfully and forcibly enters" the residence].)

### (2) Involuntary manslaughter

Defendant asserts the trial court erred in failing to instruct the jury sua sponte on involuntary manslaughter as a lesser included offense based on defendant's voluntary intoxication. We disagree.

Penal Code section 192, subdivision (b), defines involuntary manslaughter as "the unlawful killing of a human being without malice" during "the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." "Voluntary intoxication can prevent formation of any specific intent requisite to the offense at issue, but it can never excuse homicide." (*People v. Boyer* (2006) 38 Cal.4th 412, 469 (*Boyer*).) Hence, in general at the time the defendant committed his crimes, voluntary intoxication could reduce a criminal homicide to involuntary manslaughter only if the defendant was rendered unconscious: "When a person renders himself or herself unconscious through voluntary intoxication and kills in that state, the killing is attributed to his or her negligence in self-intoxicating to that point, and is treated as involuntary manslaughter." (*People v. Ochoa* (1998) 19 Cal.4th 353, 423.)[12]

Here, although there was evidence defendant had been drinking, there is no evidence he was unconscious or otherwise unaware of his actions. Immediately

---

[12] In 1995, the year these crimes occurred, Penal Code former section 22 (now Penal Code section 29.4) "was amended to provide prospectively that when the charge is murder, 'voluntary intoxication is admissible solely on the issue . . . [of] whether the defendant premeditated, deliberated, or harbored express malice aforethought.' (Stats. 1995, ch. 793, § 1, p. 6149.)" (*Boyer*, *supra*, 38 Cal.4th at p. 469, fn. 40.) Because the amendment took effect after these crimes were committed, it does not apply here. (See generally *People v. King* (1993) 5 Cal.4th 59, 79 ["any statute ' "which makes more burdensome the punishment for a crime, after its commission" ' violates the ex post facto prohibition of the United States Constitution"].)

after the murders, defendant told his coperpetrators that he had shot Durbin because he thought Durbin was getting a gun. Later that night, defendant told his nephew Jesse Rangel that he "put those motherfuckers on ice." Shortly after the murders, defendant told Frank Sr. that defendant and Little Pete "had went and done a shooting," and told Frank Jr. that "[t]hey went to the house and shot the house up." Defendant also attempted to fabricate an alibi. He gave police a detailed description of his activities on the night of the murders, falsely claiming to have worked at a convenience store. He manufactured a videotape to support his false alibi. He also asked others to hide weapons used in the crimes. Defendant gave Juan Ramirez a rifle that had fired casings found at the crime scene and a gun that ballistics evidence established was "probably" one of the murder weapons, asked Ramirez to dispose of the weapons, and added they "had resolved their problem." Defendant also gave Frank Jr. a .38-caliber revolver that "match[ed]" the .38-caliber bullets found at the crime scene and asked him to "hold this for me." Defendant's efforts to fabricate an alibi and to hide the murder weapons provide some additional indication that defendant had been aware of his actions during the course of his offenses and therefore was not unconscious during them. (Cf. *People v. Halvorsen* (2007) 42 Cal.4th 379, 416-419 [no substantial evidence of unconsciousness when the defendant's own detailed testimony regarding the shootings and the "complicated and purposive nature of his conduct" during the offenses demonstrated he did not lack awareness during them]; *People v. Abilez* (2007) 41 Cal.4th 472, 481, 516 (*Abilez)* [evidence did not "even hint[] that defendant was so grossly intoxicated as to have been considered unconscious" when he went to his mother's home, spoke to his brother, killed his mother and then ransacked two bedrooms, loaded his mother's car with stolen items before driving away, and then tried to sell the stolen goods].) Accordingly, the trial court

42

did not err in failing to instruct sua sponte on involuntary manslaughter due to voluntary intoxication.

Moreover, any assumed error in failing to instruct on involuntary manslaughter was harmless under any standard. (*Abilez*, *supra*, 41 Cal.4th at p. 516.) The prosecution proceeded on a theory of premeditated murder, and the court instructed the jury on the effect of voluntary intoxication on defendant's ability to premeditate and deliberate.[13] The jury found defendant guilty of the first degree murders of Uribe and Durbin, and therefore necessarily found he had premeditated and deliberated despite his use of alcohol. These mental states are incompatible with unconsciousness.

### c. *Voluntary intoxication*

Defendant contends the trial court erroneously failed to instruct sua sponte on the effect of voluntary intoxication on his ability to form the intent to aid and abet criminal conduct that resulted in Uribe's murder as a natural and probable consequence. We reject the claim.

" ' "A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime." ' " (*People v. Favor* (2012) 54 Cal.4th 868, 881.) Although a defendant may present evidence of voluntary intoxication on the question of

---

**13** The trial court instructed the jury: "In the crime[] of murder in the first degree . . . , a necessary element is the existence in the mind of the defendant of the mental state of premeditation and deliberation. If the evidence shows that the defendant was intoxicated at the time of the alleged crime, you should consider that fact in deciding whether defendant had the required mental state. If from all the evidence you have a reasonable doubt whether the defendant formed that mental state, you must find that he did not have such mental state."

whether he or she formed the intent to aid and abet a crime, intoxication is irrelevant in deciding what is reasonably foreseeable in the context of the natural and probable consequences doctrine. (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1131, 1133-1134.) Here, the trial court did not instruct the jury it could find defendant guilty of Uribe's murder under the natural and probable consequences doctrine. Rather, the prosecution's theory was that defendant had aided and abetted *the murder*; there was no evidence that defendant aided and abetted some lesser "target" crime of which Uribe's murder was a natural and probable consequence. The trial court did instruct the jury on the natural and probable consequences doctrine as to Cindy Durbin's *attempted* murder, of which defendant was acquitted, but there is no reasonable likelihood the jury understood this instruction, which specifically referred to the charged offense of attempting to murder Cindy Durbin, to pertain to defendant's culpability for Uribe's murder.[14]

### d. Accomplice testimony

Defendant contends that the trial court erred in failing to sua sponte instruct that the statements of Little Pete introduced through the testimony of Jesse Rangel and Frank Rangel, Jr. were to be viewed with caution and required corroboration. (Pen. Code, § 1111 [requiring accomplice testimony be corroborated]; see *ante*, at pp. 34-35.) Not so.

---

[14] The trial court instructed the jury: "One who aids and abets another in the commission of a crime is not only guilty of that crime, but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crime originally aided and abetted. In order to find the defendant guilty of the attempted murder of Cindy Durbin, you must be satisfied beyond a reasonable doubt that: One, the crime of murder was committed. Two, the defendant aided and abetted that crime. Three, that a co-principal in that crime committed the crime of attempted murder. And four, the crime [of] attempted murder was a natural and probable consequence of the commission of the crime of murder."

44

Little Pete's statements did not require corroboration because he "did not testify, nor were his 'out-of-court statements made under questioning by police or under other suspect circumstances.' (*People v. Carrington* (2009) 47 Cal.4th 145, 190 . . . ; see *People v. Williams* (1997) 16 Cal.4th 153, 245-246 . . . .) Hence no instruction under [Penal Code] section 1111 was required." (*Maciel*, *supra*, 57 Cal.4th at p. 527.)

To the extent that he asserts it, defendant forfeited his claim that the jury should have been instructed that Jesse Rangel was also an accomplice whose testimony required corroboration because Jesse shot at Uribe's empty car the night after Little Pete was shot, Cindy Durbin initially identified Jesse as one of the shooters, and Jesse fled to New Mexico. As noted above, the trial court offered to instruct the jury to determine whether Jesse Rangel was an accomplice, and, if so, that his testimony required corroboration. (See *ante*, at pt. II.B.3.c.) Defendant objected and the instruction was removed.

### e. Accessory

Defendant contends the trial court erroneously refused to instruct the jury on the lesser related offense of being an accessory to a felony in violation of Penal Code section 32. (*People v. Birks* (1998) 19 Cal.4th 108, 136-137.) Not so. The prosecutor objected to such an instruction. Under *Birks*, "instruction on a lesser related offense is proper only upon the mutual assent of the parties." (*People v. Taylor* (2010) 48 Cal.4th 574, 622.)

### C. Penalty Phase Issues

#### 1. Exclusion of mitigating evidence

During the defense case in the guilt phase, Fitzsimmons testified he had used methamphetamine at the Durbin residence about 10 to 15 minutes before the attack. Defendant contends that the trial court erred by excluding evidence that

45

murder victim Juan Uribe was a drug dealer, victim Chuck Durbin was Uribe's client and had a high level of methamphetamine in his system at the time of his death, and there was drug paraphernalia in the Durbin home at the time of the murders.[15]  Defendant asserts the "prosecution was offered a clear and direct path to demonstrate that both [victims] were moral beacons, adept at the task of parenting, whose presence would be missed," "Uribe was cast as particularly useful in providing income to the family," although "the source of his income was excluded," and "Chuck Durbin was cast as a moral guidepost for his family members."

Just as a prosecutor may present evidence rebutting a defendant's evidence of his good character (*People v. Rodriguez* (1986) 42 Cal.3d 730, 791), a defendant may present evidence rebutting the prosecution's evidence of a victim's good character (*People v. Duff* (2014) 58 Cal.4th 527, 564-565 (*Duff*)). Nonetheless, when a prosecutor presents evidence rebutting evidence of a defendant's good character, "the scope of rebuttal must be specific, and evidence presented or argued as rebuttal must relate directly to a particular incident or character trait defendant offers in his own behalf." (*Rodriguez*, at p. 792, fn. 24.) Thus, when a defendant's mitigating evidence pertains solely to difficulties he has encountered in his life and not his good character, the prosecutor is precluded from introducing on rebuttal bad character evidence regarding the defendant. (*People v. Loker* (2008) 44 Cal.4th 691, 725; *People v. Ramirez* (1990) 50 Cal.3d 1158, 1193 (*Ramirez*).)  Similarly, when the prosecution's evidence simply describes the effect the victim's death has had on his family and friends, a defendant is

---

[15]    The trial court permitted defendant to ask Martha Melgoza, Juan Uribe's girlfriend, if she was aware of Uribe's acts of violence, and how that affected her relationship with him, but the defense ultimately declined to do so.

generally precluded from introducing bad character evidence regarding the victim. (*Duff*, at p. 565; *People v. Boyette* (2002) 29 Cal.4th 381, 445 (*Boyette*).)

"The right to present rebuttal, or 'negative,' victim impact evidence to counter evidence offered by the People in their penalty case-in-chief is subject to the usual evidentiary constraints that proffered evidence must be relevant and more probative than prejudicial. [Citations.] We review the trial court's decision to limit or exclude rebuttal victim impact evidence on these grounds for abuse of discretion." (*Duff*, *supra*, 58 Cal.4th at p. 565.)

Here, the prosecution evidence focused on the effect of the murders on surviving family members and a friend, and not on the victims' character. (See *ante*, pt. I.B.1.) Thus the evidence "left no misleading portrayal of the victim to which the defendant's proffered negative impact evidence might offer relevant rebuttal." (*Duff*, *supra*, 58 Cal.4th at p. 565.) "Testimony from the victims' family members was relevant to show how the killings affected *them*, not whether they were *justified* in their feelings due to the victims' good nature and sterling character. Accordingly, defendant was not entitled to disparage the character of the victims . . . ." (*Boyette*, *supra*, 29 Cal.4th at p. 445.) Although Uribe's mother did testify without elaboration he was a "good brother" to his sisters and made sure the family was fed and the bills were paid, the testimony did not suggest that Uribe was uninvolved in misconduct, and the trial court therefore did not abuse its discretion in determining that the testimony did not open the door to evidence of Uribe's drug dealing. (See *Ramirez*, *supra*, 50 Cal.3d at p. 1193.)

Defendant also contends that excluding this evidence "deprived the defense of an opportunity to argue that dangerous drug users were in the Durbin house, helping to explain if not excuse the use of deadly force." More specifically, he argues that "[a] self defense response would have been considered as more reasonable in view of evidence that the occupants of the Durbin house were

47

engaged in a pattern of serious drug abuse." As previously explained (see *ante*, pt. II.B.4.b.(1)(ii)), defendant had no right to claim imperfect self-defense because he was the initial aggressor and Durbin's response to a home invasion by armed assailants was legally justified. Defendant's argument that he should have been permitted to introduce evidence of the victims' drug use to shore up his self-defense argument is unpersuasive.

### 2. *Victim impact evidence*

Defendant contends that the trial court erred in admitting evidence that Chuck Durbin's daughter Natasha died nearly two years after her father's murder, and that his son had a relatively mild form of autism. This evidence was properly introduced to show the effect of the murder on Cindy Durbin, who testified it was difficult to deal with her daughter's death without her husband. The jury also could reasonably infer it was difficult to deal with her son's disability without Chuck's assistance. (*People v. Brown* (2004) 33 Cal.4th 382, 397-398 [their recollections "simply served to explain why they continued to be affected by [the] loss"].)

### 3. *Asserted confrontation clause violation*

Defendant contends that admitting statements Durbin's daughter Natasha made to an officer and to her grandmother on the night of the murders prejudicially violated his rights under the confrontation clause. Assuming, without deciding, that the confrontation clause applies to penalty phase evidence, we reject defendant's contention.

As noted above, Durbin's daughter Natasha died from influenza nearly two years after Durbin was killed. At trial, Corporal Ciapessoni testified he was the first officer to arrive at Durbin's house on the night of the murders, and found Cindy Durbin in the kitchen with her three crying children. Natasha told Corporal

48

Ciapessoni she had been asleep in the living room and awoke to see two unfamiliar men in the kitchen. She heard one of the men say, "Juan, you disappointed us," and then heard gunshots. She then observed two men leave the residence. Natasha thought she could identify the men.

Durbin's children were later taken by their grandmother, Ginger Colwell, to Colwell's house. Natasha told Colwell, "[G]randmother, they were calling Juan a traitor." Colwell asked if Chuck said anything. Natasha said he told her to run and hide. Natasha put a pillow over her two siblings, and "pulled the covers up so they wouldn't get hurt."

Natasha's statements to her grandmother "clearly were not made with the primary purpose of creating evidence for [defendant's] prosecution." (*Ohio v. Clark*, *supra*, 576 U.S. at p. ___ [135 S.Ct. at p. 2181].) Hence they were not testimonial and, thus, were properly admitted. (*Ibid*.) Even assuming Corporal Ciapessoni's testimony was erroneously admitted, that error was harmless beyond a reasonable doubt. Evidence of Natasha's statement to Corporal Ciapessoni was cumulative to her statement to her grandmother and to Cindy Durbin's guilt phase testimony that one of the attackers said "Juan was a traitor."

### 4. *Asserted instructional error*

#### a. *Motive*

Defendant contends the trial court erroneously refused to instruct the jury that defendant's motive for killing Uribe was a mitigating factor. In his proposed instructions he requested the trial court instruct the jury to consider "[w]hether or not the victim in whole, or in part, contributed to the extreme mental or emotional state of the defendant." There was no discussion of this proposed instruction, nor was the proposed instruction read to the jury. The claim is therefore forfeited.

49

(See *People v. Homick* (2012) 55 Cal.4th 816, 871 [failure to press for a ruling on a requested limiting instruction forfeits any claim of error].)

Defendant also requested that the court instruct the jury: "You may consider the motive for the commission of the crime as a mitigating factor which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any other aspect of the defendant's character or background that the defendant offers as a basis for a sentence less than death." The court refused this instruction, saying it was confusing, given that the prosecutor would argue the motive evidence was aggravating. The court correctly stated that both parties could argue motive and that it was up to the jury to decide whether the motive evidence was aggravating or mitigating.

Defendant asserts the jury understood the court's instruction in the language of Penal Code section 190.2, factor (k), to provide that "motive was not something which could be considered at all in mitigation." That instruction provided that the jury may consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character, background or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." There is no reasonable likelihood the jury understood that instruction to provide that it could not consider defendant's motive as a mitigating factor.

### b. *Assessment of mitigating evidence*

Defendant contends the trial court erroneously refused to instruct the jury that mitigating circumstances need not be proved beyond a reasonable doubt. The United States Supreme Court has held a trial court need not so instruct. (*Kansas v. Carr* (2016) 577 U.S. ___, ___ [136 S.Ct. 633, 642] ["our case law does not

require capital sentencing courts 'to affirmatively inform the jury that mitigating circumstances need not be proved beyond a reasonable doubt' "]; accord, *Samayoa*, *supra*, 15 Cal.4th at p. 862.)

Defendant further contends the trial court erroneously refused to instruct the jury that it could consider as mitigating the "favorable treatment received by someone you personally believe to be an accomplice." "We have consistently held that evidence of an accomplice's sentence or of the leniency granted an accomplice is irrelevant at the penalty phase because ' "it does not shed any light on the circumstances of the offense or the defendant's character, background, history or mental condition." ' " (*Maciel*, *supra*, 57 Cal.4th at p. 549.)

### c. *Circumstantial evidence*

Defendant contends the trial court erroneously failed to instruct the jury sua sponte in the language of CALJIC No. 2.01, which generally addresses the sufficiency of circumstantial evidence to prove a defendant's guilt of a crime, and CALJIC No. 2.02, which addresses the sufficiency of circumstantial evidence to prove a defendant's specific intent or mental state. There was no error. The prosecution introduced only victim impact evidence at the penalty phase and, hence, did not rely on circumstantial evidence. (*Edwards*, *supra*, 57 Cal.4th at p. 766 [no CALJIC No. 2.01 instruction required when no unadjudicated crime relied on circumstantial evidence].)

### 5. *Automatic motion to modify*

Defendant contends that the trial court erroneously relied on premeditation as a circumstance of the crime in denying the automatic motion to modify because there was insufficient evidence that Chuck Durbin's murder was premeditated. We have concluded substantial evidence supported the jury's finding of premeditation and therefore reject this claim. (See *ante*, pt. II.B.1.a.)

51

### 6. *Challenges to the capital sentencing scheme*

Defendant contends that California's death penalty statute is constitutionally invalid in numerous respects. We have repeatedly rejected similar claims and do so again here as follows:

"[T]he California death penalty statute is not impermissibly broad, whether considered on its face or as interpreted by this court." (*People v. Dykes* (2009) 46 Cal.4th 731, 813.) The death penalty statute does not lack safeguards to avoid arbitrary and capricious sentencing, deprive defendant of the right to a jury trial, or constitute cruel and unusual punishment on the ground that it does not require either unanimity as to the truth of aggravating circumstances or findings beyond a reasonable doubt that an aggravating circumstance (other than Penal Code section 190.3, factor (b) or (c) evidence) has been proved, that the aggravating factors outweighed the mitigating factors, or that death is the appropriate sentence. (*People v. Whalen* (2013) 56 Cal.4th 1, 90; *Dykes*, at p. 814; *Avila*, *supra*, 46 Cal.4th at p. 724.) Nothing in *Hurst v. Florida* (2016) ___ U.S. ___ [136 S.Ct. 616],[16] *Cunningham v. California* (2007) 549 U.S. 270, *Blakely v. Washington*

---

[16]    In *Hurst v. Florida*, the United States Supreme Court recently held that Florida's sentencing scheme violates the Sixth Amendment in light of *Ring v. Arizona* (2002) 536 U.S. 584. (*Hurst v. Florida*, *supra*, ___ U.S. at p. ___ [136 S.Ct. 616, 621].) The California sentencing scheme is materially different from that in Florida. Here, a jury weighs the aggravating and mitigating circumstances and reaches a unanimous penalty verdict that "impose[s] a sentence of death" or life imprisonment without the possibility of parole. (Pen. Code, §§ 190.3, 190.4.) Unlike Florida, this verdict is not merely "advisory." (*Hurst*, at p. 622.) If the jury reaches a verdict of death, our system provides for an automatic motion to modify or reduce this verdict to that of life imprisonment without the possibility of parole. (Pen. Code, § 190.4.) At the point the court rules on this motion, the jury "has returned a *verdict or finding* imposing the death penalty." (Pen. Code, § 190.4, italics added.) The trial court simply determines "whether the jury's findings and verdicts that the aggravating circumstances

*(footnote continued on next page)*

(2004) 542 U.S. 296, *Ring v. Arizona*, *supra*, 536 U.S. 584, or *Apprendi v. New Jersey* (2000) 530 U.S. 466, affects our conclusions in this regard. (*Dement*, *supra*, 53 Cal.4th at p. 55.) "Written findings by the jury during the penalty phase are not constitutionally required, and their absence does not deprive defendant of meaningful appellate review." (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1097.) "Use of the adjectives 'extreme' and 'substantial' in [Penal Code] section 190.3, factors (d) and (g) is constitutional." (*Dement*, at p. 57.) A "prosecutor's discretion to select those eligible cases in which the death penalty is sought does not offend the federal or state Constitution." (*People v. Wallace* (2008) 44 Cal.4th 1032, 1098.) "The federal constitutional guarantees of due process and equal protection, and against cruel and unusual punishment [citations], do not require intercase proportionality review on appeal." (*People v. Mai* (2013) 57 Cal.4th 986, 1057.)

Defendant contends that his death sentence violates international law. He points to no authority that "prohibit[s] a sentence of death rendered in accordance with state and federal constitutional and statutory requirements." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 511.)

---

*(footnote continued from previous page)*

outweigh the mitigating circumstances are contrary to law or the evidence presented." (Pen. Code, § 190.4.)

## III. DISPOSITION

We affirm the judgment.

KRUGER, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.
CUÉLLAR, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Rangel

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S076785
**Date Filed:** March 28, 2016

_____

**Court:** Superior
**County:** Madera
**Judge:** John W. DeGroot

_____

**Counsel:**

Charles M. Bonneau, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Ward A. Campbell, Kathleen A. McKenna, Brian Alvarez and Michael Dolida, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Charles M. Bonneau
331 J Street, Suite 200
Sacramento, CA  95814
(916) 444-8828

Michael Dolida
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA  94244-2550
(916) 445-8538