Filed 7/1/21  P. v. Oliver CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B307225 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. PA091947) |
| v. | |
| LARRY OLIVER, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Hayden Zacky, Judge.  Affirmed.

Robert L. Hernandez, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithy, Assistant Attorney General, Noah P. Hill and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury found Larry Oliver guilty of two counts of attempted murder based on a drive-by shooting. He was also convicted of several assault and firearm charges. On appeal, he raises two claims of instructional error, and argues the trial court erred in denying his motion for new trial based on ineffective assistance of counsel. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

### 1. The Confrontation and Shooting

On December 1, 2018, at around 4:00 p.m., gang member and victim Irell McMillan entered an Auto Zone store in a strip mall. Appellant, a member of a different gang, followed McMillan and confronted him. McMillan knew appellant. When appellant suggested the two "step outside," McMillan told him if he wanted to fight, they should do so inside the store. Appellant left the store, and joined fellow gang member Brandon Burris on the sidewalk. McMillan exited shortly thereafter, and saw appellant taking off his sweatshirt as if preparing to fight. McMillan quickly walked over to his car, a black Mercedes, and drove away with a companion, victim Khariana Houston in the front passenger seat.

After driving a few minutes, McMillan parked his car on the street. He was sitting in his car with the engine still running when he heard a loud sound. He looked in the rear-view mirror and saw appellant "hanging out the window" of a car shooting at him. A woman was driving, and appellant was in the passenger seat. Appellant fired eight shots. McMillan drove off. Neither McMillan nor Houston was injured.

### 2. The Arrests

A neighbor who called 911 reported hearing shots fired and seeing a black Mercedes speed off. Ten minutes later, the police

2

pulled over McMillan in his black Mercedes. When an officer instructed McMillan to put up his hands, McMillan said "I'm the one that just got shot at!" There was a bullet hole in the trunk of McMillan's car. After finding a handgun in McMillan's car, the officers arrested him.[1]

During an interview at the police station, McMillan identified appellant as the shooter from a six-pack photographic line-up. McMillan said appellant shot at him from a dark four-door car. Later that day, the police arrested appellant. Officers recovered a loaded gun from appellant's car that did not match the caliber of the gun used in the shooting.

### 3.    *The Charges*

Appellant was charged with two counts of attempted murder (Pen. Code, §§ 664/187, subd. (a))[2], two counts of assault with a semiautomatic firearm (§ 245, subd. (b)), shooting at an occupied motor vehicle (§ 246), possession of a firearm by a felon (§ 29800, subd. (a)(1)), and unlawful possession of ammunition (§ 30305, subd. (a)(1)).[3] The information further alleged gang, firearm, and prior prison term enhancements. He pled not guilty and denied the enhancements.

### 4.    *Trial*

Contrary to his earlier statements to police, at trial McMillan testified that he did not know appellant and could not

---

[1]    The gun found in McMillan's car had no connection to the shooting.

[2]    All further undesignated statutory references are to the Penal Code.

[3]    The trial court granted the prosecution's motion to dismiss a charge of carrying a loaded firearm (§ 25850, subd. (a)).

remember identifying him as the shooter. The prosecution introduced into evidence the six-pack on which McMillan had circled appellant's photograph, as well as McMillan's recorded interview at the police station.

The prosecution also played several recordings of jail calls made separately by appellant and McMillan. Four days after the shooting, McMillan said on a call that he and appellant had been put in a cell together, and appellant had said the shooting was a "misunderstanding." McMillan had responded to appellant, "I can't see myself coming to court. I damn sure ain't gonna come and say you did nothing. But me coming trying to help you? . . . I'm not helping you shit."

On a different phone call, appellant also discussed his conversation with McMillan. Appellant said he was about to "smash" McMillan, but McMillan said he "didn't say nothing." Appellant said, "But [] how do they know everything?" On a different call later that day, appellant said he told his lawyer to talk to McMillan who would say that appellant was not the shooter. Appellant hoped the prosecution would then "drop" his charges.

The prosecution also showed the jury surveillance footage from outside the Auto Zone store on the day of the shooting. In the video, appellant is shown entering the Auto Zone store and gesturing energetically. Appellant exited the store. He took off his sweatshirt, paced the sidewalk, and continued gesticulating. McMillan then left the store and walked rapidly toward his Mercedes. Appellant and gang confederate Burris walked after McMillan through the parking lot. Burris then retrieved an object from his own car, a dark four-door sedan, and handed appellant what an officer testified appeared to be a handgun.

4

Appellant tucked the item in his waistband. McMillan started driving off, and appellant walked off screen toward an exit. Burris drove his black sedan to the same exit and paused briefly—the car was partially off screen when it paused. The video did not depict the dark sedan following McMillan's car or the shooting.

**5.    *Verdict and Sentencing***

The jury convicted appellant of all counts, and found true the gang and firearm allegations. The jury was unable to reach a verdict as to whether the attempted murder of McMillan was willful, deliberate or premeditated, and found that allegation not true as to the attempted murder of Houston. The trial court dismissed the prior prison term allegation.

Appellant was sentenced to 15 years to life for shooting at an occupied motor vehicle. The court imposed but stayed punishment on the assault counts. As to the remaining counts, including the two attempted murder charges, the court imposed concurrent sentences. Appellant timely appealed.

## *DISCUSSION*

**1.    *CALCRIM No. 315***

Appellant argues the trial court erred in instructing the jury with CALCRIM No. 315 on eyewitness identification evidence. Among other factors, this instruction directs the jury to consider "how certain" an eyewitness was when he or she "made an identification." Appellant contends the error violated his state and federal constitutional right to due process, citing to case law noting that scientific studies have found "a weak correlation between witness certainty and accuracy . . . ." (See *People v. Sanchez* (2016) 63 Cal.4th 411, 462.)

Appellant acknowledges his counsel did not object to this instruction in the trial court or request that the trial court modify CALCRIM No. 315 to remove the challenged language. The Attorney General argues appellant has forfeited this claim. (See *Sanchez*, *supra*, 63 Cal.4th at p. 461 ["If defendant had wanted the court to modify the [eyewitness identification] instruction, he should have requested it. The trial court has no sua sponte duty to do so."]; see also *People v. Rodriguez* (2019) 40 Cal.App.5th 194, 199–200 ["Rodriguez argues CALCRIM No. 315 violates his Fourteenth Amendment due process rights because it tells the jury to consider eyewitness certainty. Rodriguez's counsel did not object at trial. This is forfeiture."].)

Appellant asserts there was no forfeiture because it would have been futile to object before the trial court. (See *People v. Gomez* (2018) 6 Cal.5th 243, 286–287 ["Reviewing courts have traditionally excused parties for failing to raise an issue at trial where an objection would have been futile . . . ."].)

As of the time trial started on October 29, 2019, the Supreme Court had upheld the inclusion of the certainty factor in CALJIC No. 2.92, the predecessor to CALCRIM No. 315.[4] (*Sanchez*, *supra*, 63 Cal.4th at p. 462; *People v. Rangel* (2016) 62 Cal.4th 1192, 1215 [no forfeiture where the governing law at the time of trial "afforded scant grounds for objection."].) However, the question of the continued inclusion of the certainty of eyewitness identification in CALCRIM No. 315 had been pending in our Supreme Court for over a year prior to the start of

---

[4]     Although the Supreme Court analyzed CALJIC No. 2.92, it cited to similar language used in CALCRIM No. 315. (See *Sanchez*, *supra*, 63 Cal.4th at p. 461.)

trial.  The issue remained pending throughout trial.  (See *People v. Lemcke* (June 21, 2018, G054241) [nonpub. opn.], review granted Oct. 10, 2018, S250108.).)  Under these circumstances, we conclude that appellant forfeited the argument by not objecting.[5]

## 2.    *Kill Zone Instruction*

Appellant was found guilty of attempted murder of both victims McMillan and Houston.  As to Houston, appellant argues that the attempted murder must be reversed because of error in instructing on the kill zone theory of attempted murder.[6]  He contends the trial court erred by giving CALCRIM 600 about the kill zone theory because the instruction failed to specify the jury had to find that Houston was located within the kill zone.

---

[5]    While this appeal was pending, the Supreme Court filed its opinion in *People v. Lemcke,* holding that CALCRIM No. 315 did not violate the defendant's due process rights despite empirical research showing that confidence in a witness identification is generally not a reliable indicator of accuracy.  (*People v. Lemcke* (2021) 11 Cal.5th 644.)  However, the Court recognized the risk that the instruction "will prompt jurors to infer that an eyewitness's certainty in an identification is generally a reliable indicator of accuracy."  (*Id.* at p. 669.)  Accordingly, utilizing its supervisory powers, the Court directed, except when a defendant asks for the instruction, "trial courts to omit the certainty factor from CALCRIM No. 315 until the Judicial Council has the opportunity to consider how the language might be better worded to minimize juror confusion on this point."  (*Ibid.*)

[6]    Appellant makes no similar argument as to victim McMillan.  It apparently is undisputed on appeal that appellant intended to kill McMillan who was the target victim.

7

Appellant also contends the instruction was not supported by substantial evidence.

### A.     The Law

Under California law, a perpetrator cannot be found guilty of an attempt to commit a crime unless he or she intends to commit the crime.  "To prove the crime of attempted murder, the prosecution must establish 'the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.'  [Citation.]  When a single act is charged as an attempt on the lives of two or more persons, the intent to kill element must be examined independently as to each alleged attempted murder victim; an intent to kill cannot be 'transferred' from one attempted murder victim to another under the transferred intent doctrine.  [Citation.]" (*People v. Canizales* (2019) 7 Cal.5th 591, 602 (*Canizales*).)

California has embraced the concept "of a *concurrent* intent to kill." (*Canizales*, *supra*, 7 Cal.5th at p. 602.)  "In some situations, the defendant may intend to ensure harm to the primary victim by harming everyone in the intended victim's vicinity – such as by an explosive device or a hail of bullets.  In such a case, the factfinder can infer that, whether or not the defendant was successful in killing the intended victim, the defendant concurrently intended to kill everyone in the victim's immediate vicinity to ensure the primary victim's death.  When the defendant, in the attempt to kill an intended victim, chooses a means of killing that creates a zone of harm around the victim, the factfinder may reasonably infer that the defendant intended to harm everyone in that zone." (*People v. Mariscal* (2020) 47 Cal.App.5th 129, 137, citing *Canizales, supra,* at pp. 602–603.)

8

"In determining the defendant's intent to create a zone of fatal harm and the scope of any such zone, the jury should consider the circumstances of the offense, such as the type of weapon used, the number of shots fired (where a firearm is used), the distance between the defendant and the alleged victims, and the proximity of the alleged victims to the primary target. Evidence that a defendant who intends to kill a primary target acted with only conscious disregard of the risk of serious injury or death for those around a primary target does not satisfy the kill zone theory." (*Canizales*, *supra*, 7 Cal.5th at p. 607.) "[T]he kill zone theory does not apply where 'the defendant merely subjected persons near the primary target to lethal risk. Rather, in a kill zone case, the defendant has a primary target and reasons [that] he cannot miss that intended target if he kills everyone in the area in which the target is located. In the absence of such evidence, the kill zone instruction should not be given.'" (*Ibid.*)

In *Canizales*, our Supreme Court cautioned that "there will be relatively few cases" in which the kill zone theory will be applicable and a kill zone instruction appropriate. (*Canizales*, *supra*, 7 Cal.5th at p. 608.) Such an instruction is only appropriate when there is evidence that: "(1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm — that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death — around the primary target; and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm." (*Id.* at pp. 596–597.)

9

### B. The Instruction

In this case, the jury was instructed, without objection, with a modified version of CALCIM No. 600: "A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.' In order to convict the defendant of the attempted murder of Khariana Houston, the People must prove that the defendant not only intended to kill Irell McMillan but also either intended to kill Khariana Houston, or intended to kill everyone within the kill zone. If you have a reasonable doubt whether the defendant intended to kill Khariana Houston or intended to kill Irell McMillan by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of Khariana Houston."

During closing argument, the prosecutor addressed the kill zone theory:

"So what factors do you have to consider? [¶] The type of weapon used. The type of weapon used is a semi-automatic pistol and can fire rapidly. [¶] The caliber of the round. He used -- I believe it was a .40, which is a heavier impact. You can see the size of the bullet hole in the trunk. It's not a .22. A .22 smaller caliber. It's a heavier caliber weapon. [¶] The number of shots fired were eight shots. If it was a ten-round magazine, he would have almost emptied the magazine. [¶] The distance from the shooter to the victim. You can see where the cars parked and where that last white marker is on the street. And it's probably just less than a street width apart. A residential street width apart. That was at the intersection -- that's how close he got to them. [¶] And then the proximity of the alleged victim to the primary target. The prim[ary] target being Irell McMillan. How

10

close was Khariana to Irell McMillian at the time these eight rounds were shot?  One center console away.  One center console away in the front of a relatively small Mercedes four-door sedan."

### C.     Forfeiture

Relying on *Canizales, supra,* 7 Cal.5th 591, appellant argues the court should have instructed the jury that before it could apply the kill zone theory, the jury first needed to find that Houston was in the kill zone.  Respondent contends that appellant forfeited his claim of error by failing to object in the trial court or request an alternate instruction.  We agree with respondent.

First of all, appellant concedes in his opening brief that *Canizales* was filed before the trial in the present case.  So, appellant could have proposed a modified instruction based on language in the Supreme Court opinion.  Appellant also points to the now-revised CALCRIM 600 instruction that was prompted by language in *Canizales*.  But, he does not contend that the instruction as given was an incorrect statement of law.  Nor did *Canizales*:  the defendant "asserts that CALCRIM No. 600, the standard instruction on attempted murder that was given in the case, does not adequately explain the kill zone theory.  We agree that, when a kill zone instruction is legally warranted and in fact provided, the standard instruction should be revised to better describe the contours and limits of the kill zone theory as we have laid them out here." (*Canizales, supra,* 7 Cal.5th at p. 609.)  The Supreme Court did not hold that it was error for the trial court to have given CALCRIM No. 600, only that additional language would better describe the kill zone rule.[7]  Generally, a

---

[7]     The court cited CALCRIM 600 on several occasions during the opinion but did not disapprove the instruction.  Specifically,

" ' party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' " (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1163, *as modified* (Apr. 16, 2009).)

As appellant did not object or ask the court to modify the instruction, he has forfeited this claim. (See *People v. Nguyen* (2015) 61 Cal.4th 1015, 1051 [if the instruction is incomplete, defendant must request clarifying language].)

Appellant's argument is also without merit. In reviewing a purportedly erroneous jury instruction, we inquire as to whether there is a reasonable likelihood the jury applied the challenged instruction in a way that violates the Constitution. (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1246, overruled on other grounds in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.) Here, the trial court instructed the jury that it could find appellant guilty of attempted murder only if it was shown that he "either intend[ed] to kill" Houston "or intended to kill *everyone within the kill zone.*" (Emphasis added.) As the court instructed the jury that a victim had to be in the kill zone for the theory to apply, there was no reasonable likelihood the jurors would have applied the theory to Houston without also finding she was in the kill zone.

---

the court stated: "[i]n light of our conclusion that the judgment must be reversed because the evidence was insufficient to support an instruction on the kill zone theory, we need not address defendants' constitutional challenge to CALCRIM No. 600." (*Canizales, supra,* 7 Cal.5th at p. 598.)

## D. The Instruction Was Supported by Substantial Evidence

Appellant next argues the kill zone instruction was not supported by substantial evidence. In determining whether "there is sufficient evidence from which the jury could find that the *only* reasonable inference is that the defendant intended to kill (not merely to endanger or harm) everyone in the zone of fatal harm," we consider the circumstances surrounding the shooting, including "the type of weapon used, the number of shots fired (where a firearm is used), the distance between the defendant and the alleged victims, and the proximity of the alleged victims to the primary target." (*Canizales*, *supra*, 7 Cal.5th at pp. 597, 607.)

Respondent argues the circumstances of the shooting here support a reasonable inference appellant intended to kill everyone in the zone of fatal harm around appellant's primary target, McMillan. Appellant used a firearm capable of firing numerous shots rapidly, he fired eight times at McMillan's car, he fired the shots from less than a street's width away, and McMillian and Houston were in close proximity inside the car.

Appellant does not dispute there was substantial evidence from which the jury could infer that McMillan was the primary target in the shooting. (*Canizales*, *supra*, 7 Cal.5th at p. 609.) Rather, he argues that other circumstances support a reasonable inference he acted not with specific intent to kill everyone in the car but with at most a conscious disregard of the risk Houston might be injured or killed. He relies on the following evidence. First, appellant fired shots from a handgun, not a high-powered rifle. Second, he fired no more than eight shots. Third, the shots

13

were fired from a stationary car towards another car, not by a pedestrian. Lastly, only one shot struck McMillan's car.

The supporting authority on which appellant relies is distinguishable. Appellant first cites to *In re Rayford* (2020) 50 Cal.App.5th 754 where the court found insufficient evidence supported a kill zone instruction, and noted that the guns used by the defendants were not "rapid-firing semiautomatic or automatic weapons." (*Id.* at p. 779.) Appellant relies on *In re Rayford* for his argument that a handgun is less dangerous than a "high-powered" firearm. Appellant ignores that he used a semi-automatic handgun which was capable of firing rapidly, as demonstrated by the flurry of bullets fired at the victims.

Appellant also cites to *People v. Cardenas* (2020) 53 Cal.App.5th 102. He argues that the Court of Appeal there concluded the firing of 16 shots when the defendant was on foot was insufficient evidence of a kill zone; here appellant fired seven or eight rounds from a moving car. The number of bullets in *Cardenas* was not central to that court's analysis; rather, the court focused on the distance between the primary target and other victims, and between the shooters and victims. (*Id.* at pp. 114–115.) In *Cardenas*, the attempted murder victims were in a parking lot at least five feet away from the primary target. Here, while appellant was firing at them from a residential street's width away, Houston was seated next to McMillan in a car with the doors shut. (*Ibid.*)

Appellant also analogizes the circumstances of this shooting to *People v. Booker* (2020) 58 Cal.App.5th 482 where the defendant's car "pulled up next to" the driver's side of a stationary car, and "a hand emerge[d] from the front passenger window" and fired three to seven shots directly at the driver. (*Id.*

14

at p. 500.) The driver was struck twice in the head and once in the arm. (*Ibid.*) He died from his injuries, however, a passenger sitting next to him during the shooting was not injured. (*Ibid.*) The Court of Appeal found insufficient evidence to support a kill zone instruction, noting that only "the driver's side front window of [the victim's] car was shattered," and there was no evidence reflecting "a spray of bullets." (*Ibid.*) Here, unlike *Booker* where the shooter shot the victim "at close range," appellant was a residential street's length away when he shot a spray of bullets directed at the rear of the car carrying McMillan and Houston. (*Ibid.*)

Finally, appellant's argument that only one bullet struck McMillan's car does not diminish the sufficiency of the evidence. The prosecution presented evidence that appellant was inebriated, had bad eyesight, and fired the shots in the direction of McMillan's car. No evidence suggested that appellant was aiming anywhere other than the car where McMillian and Houston sat side by side. Using the instruction's language, the only reasonable inference supported by the record is that appellant intended to create a kill zone in the car in order to kill McMillan.

3. ***Denial of the New Trial Motion on Grounds of Ineffective Assistance of Counsel***

Appellant contends the trial court erred in denying his motion for new trial based on ineffective assistance of his counsel during closing argument.

A. **Trial Court Proceedings**

Prior to trial, appellant hired private counsel and the trial court relieved the alternate public defender's office as attorney of record. After he was convicted, appellant substituted new private

counsel and moved for a new trial on the ground of ineffective assistance of trial counsel. Appellant argued that trial counsel's closing argument was "grossly deficient" as counsel (1) did not address principles in appellant's favor such as the presumption of innocence; (2) did not challenge "central elements of the prosecution's case" such as McMillan's eyewitness identification; (3) did not present the jury with an "alternative narrative that would support a verdict of acquittal"; and (4) made claims that were not supported by the evidence citing to counsel's argument that appellant was no longer a gang member.

In opposition, the prosecution argued that counsel's purported errors were not prejudicial given evidence of appellant's consciousness of guilt revealed through his recorded jail calls, and circumstantial evidence that the shooting occurred minutes after his confrontation with McMillan at the Auto Zone store.

The court concluded that "certain aspects of [trial counsel's] performance are lacking," but found appellant failed to demonstrate prejudice. The court pointed to the videos which showed that (1) appellant and McMillan had a verbal confrontation in the Auto Zone store; (2) after leaving the store, appellant "was posturing as if ready for a physical confrontation with McMillan"; (3) appellant followed McMillan in the parking lot, then received a handgun from Burris; (4) appellant then walked to the end of the parking lot; and (5) Burris got into a car matching the description of the car involved in the shooting and drove to the end of the parking lot in the direction appellant had been walking. The court concluded the videos showed that appellant "was in possession of a gun in his waistband . . . and

16

went toward that black four door and the 9-1-1 call was made within five, six minutes thereafter."  The court denied the motion.

### B.    The Law

"Although ineffective assistance of counsel is not among the grounds enumerated for ordering a new trial under Penal Code section 1181, motions alleging ineffective assistance are permitted pursuant to 'the constitutional duty of trial courts to ensure that defendants be accorded due process of law.' " (*People v. Callahan* (2004) 124 Cal.App.4th 198, 209.)  We review orders denying a motion for new trial on the ground of ineffective assistance of counsel for an abuse of discretion.  (*Ibid*.)

" '[A] defendant claiming a violation of the federal constitutional right to effective assistance of counsel must satisfy a two-pronged showing: that counsel's performance was deficient, and that the defendant was prejudiced, that is, there is a reasonable probability the outcome would have been different were it not for the deficient performance.' [Citations.]" (*People v. Woodruff* (2018) 5 Cal.5th 697, 736.)  A "court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." (*Strickland v. Washington* (1984) 466 U.S. 668, 697.)  As we explain below, the trial acted within its discretion in finding appellant suffered no prejudice from any deficiencies in closing argument.  That alone defeats the ineffective assistance of counsel claim.

### C.    Lack of Prejudice

Appellant's claim of prejudice is based on several asserted evidentiary shortcomings that counsel failed to exploit in argument.  He disputes that the video footage provided strong circumstantial evidence of his guilt, noting that the video "does

17

not actually show [him] getting into the black car" driven by Burris. He further argues that McMillan's identification of him as the shooter was "suspect" because McMillan only saw the shooter briefly in his rearview mirror while shots were fired. In appellant's view, that McMillan identified the driver as a woman when Burris was driving the black car undermined the prosecution's theory of the case that Burris had driven the car while appellant was shooting. Lastly, appellant argues the prosecution's case was weakened by McMillan's trial testimony that he did not know appellant and could not identify him in court.

Appellant's argument ignores the strong evidence of his guilt, some direct and other circumstantial. The video footage showed appellant following McMillan in the parking lot after an altercation and before being given a gun by a fellow gang member, and then leaving the mall shortly after McMillan. The shooting occurred a few minutes later. The evidence of in person and telephone conversations about McMillan and appellant sharing a cell suggested McMillan did know appellant, and thus was easily able to recognize him when he was "hanging out the window" behind McMillan's car. The jury was entitled to disregard McMillian's denial in the courtroom and his inability to identify appellant at that time in favor of evidence to the contrary. Appellant made incriminating statements in recorded jail conversations. McMillan's recorded conversations indicated a reluctance to testify in court which explained his later disavowal of his statements to the police.

Appellant bears the burden of establishing prejudice in his ineffective assistance claim. We are satisfied there was no

18

reasonable probability that his counsel's performance during closing argument caused a different outcome at trial.

### 4.    *No Cumulative Error*

Appellant contends his conviction must be reversed for cumulative error.  Because we have found no error, there is nothing to accumulate.  (*People v. Reed* (2018) 4 Cal.5th 989, 1018.)

## *DISPOSITION*

The judgment is affirmed.


RUBIN, P. J.

WE CONCUR:



MOOR, J.



KIM, J.

19