Filed 6/30/25  P. v. Montanez CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JAZMIN MONTANEZ,<br><br>Defendant and Appellant. | B327506<br><br>(Los Angeles County Super. Ct. No. BA425236-04) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Daniel Lowenthal, Judge.  Affirmed as modified.

Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Idan Ivri, Supervising Deputy Attorney General, Yun K. Lee, Deputy Attorney General, for Plaintiff and Respondent.

Tom Taylor was bludgeoned to death with a metal rod in the motor home where he lived, which was regularly used as a place to smoke methamphetamine by defendant and appellant Jazmin Montanez (defendant), Anthony Paz, David Romero, Alfredo De La Torre, Diana Sequen, and Jose Alfredo Zolorza. All but De La Torre were indicted for Taylor's murder, and defendant and Paz were tried together and convicted. In 2019, we affirmed Paz's murder conviction but reversed defendant's (for evidentiary and instructional error) and remanded for a new trial. (*People v. Montanez, et al.* (Feb. 26, 2019, B281120) [nonpub. opn.].) Defendant was again found guilty of murder upon retrial, and we are now chiefly asked to decide whether reversal is required for three asserted instructional errors: because the jury was not instructed accomplices Paz and Romero could not provide the sole corroboration for each other's testimony, because the jury was not instructed it should determine whether De La Torre was an accomplice to the crime (and require corroboration for his testimony if so), and because the jury was not instructed it should view out-of-court statements by defendant with caution if not written or recorded.

I

Paz, Romero, and De La Torre were the principal witnesses against defendant at her trial in 2022, and some of the incriminating testimony provided—particularly with respect to Paz and Romero—came from recorded out-of-court statements made closer in time to the murder (the admissibility of which are uncontested on appeal). The prosecution also introduced in evidence what it contended was the murder weapon—a metal rod found by a dive team in the Los Angeles riverbed (Paz told a

2

jailhouse informant in a recorded conversation that he threw the murder weapon in "the ocean"). We will elaborate on the trial evidence presented against defendant and then discuss the manner in which the jury was instructed.

A

In January 2014, Long Beach police officers on patrol in the area of Magnolia and 17th Street smelled smoke. They followed the smell and saw a burning motor home in an alley. The officers called for fire department assistance, and although there was smoke coming out of the motor home's windows, the officers were able to make entry and put out a small fire before the firefighters arrived.

When fully safe to enter the motor home, police and fire personnel discovered Taylor's dead body inside. Taylor's hands were tied behind his back, there was a gag in his mouth, there were injuries to his face and head, and portions of his body were severely burned. A fire department investigator concluded the motor home fire was intentionally started, with the point of origin for the fire being the bed where Taylor's body was found.

An autopsy later revealed the cause of Taylor's death was blunt force head trauma, specifically, multiple skull fractures, brain hemorrhaging, and lacerations to the back of the head—all of which were consistent with having been inflicted by blows from a metal rod. Taylor was also found to have suffered a fracture of the right ribs. The medical examiner opined the blunt force injuries caused Taylor's death before the fire was set.

3

B

The prosecution called De La Torre as a witness at trial and he testified about the use of Taylor's home as a place to smoke methamphetamine and about the events at the motor home on the day of Taylor's murder. He admitted he was a gang member (East Side Longo) and a methamphetamine user at the time.[1]

De La Torre explained that, around the time of the murder, he would go to Taylor's motor home a few times a week to get high on methamphetamine. Others, including defendant, Paz, Romero, and Sequen, also used methamphetamine at the motor home around the time.

Late in the evening on January 27, 2014, De La Torre received a phone call from Sequen who was at Taylor's motor home and he heard "arguing" on her side of the line; he could not recall the specifics at the time of trial, but it sounded "urgent enough" that he headed to where she was. Taylor, defendant, Paz, Romero, and Sequen were there when De La Torre arrived, and De La Torre remained outside the motor home but could see inside.

De La Torre saw "everyone" holding Taylor down near a table amidst a lot of "commotion," and defendant and Taylor were arguing about some of defendant's "stuff" that had been moved.

---

[1] De La Torre also admitted on cross-examination that he was nervous when the police interviewed him not long after Taylor's murder. He confirmed the police told him, during that interview, that they would have "no problem putting down that 187 [a murder charge] on your booking sheet and calling it a night."

4

De La Torre saw defendant "smack" Taylor two or three times in the face and heard Taylor "wailing kind of" in pain. De La Torre also saw defendant shove a sock in Taylor's mouth, and he heard her tell the others to "tie him up."

At some point, De La Torre heard defendant say "let's end this" to the others in the motor home, at which point the others then became more aggressive and held Taylor down "fiercer, harder." De La Torre also heard defendant say that she was "going to finish this motherfucker" (i.e., Taylor) and she appeared adamant about finishing him—meaning killing him—that night.

De La Torre left the area of the motor home after that and Romero left with him. De La Torre could still hear a racket and banging noises coming from the trailer while he was walking away.

Later on, De La Torre met up with defendant and Romero at Romero's apartment. De La Torre heard defendant on the phone with Paz, seeking confirmation of some sort by asking, "Is it done?" Later that night or the next day, De La Torre learned Taylor had died from having his "head . . . bashed in."

## C

Romero testified at defendant's trial quite reluctantly, and under a grant of use immunity in connection with an unrelated case. In response to an initial series of questions, he testified he entered a plea to assaulting Taylor (without any agreement with the prosecution) and he recognized who Taylor was. But he denied even recognizing defendant, Paz, De La Torre, and the others who used methamphetamine at the motor home; he variously did not remember or outright denied incriminating facts about the night when Taylor was killed; and he professed

not to remember being interviewed at length by investigating detectives after Taylor's murder. The prosecution then played in court the recording that prior interview with the police, which we now summarize.

Romero told the interviewing detectives that when he first arrived at Taylor's motor home, defendant and Taylor were arguing and defendant was "blaming him for all kinds of crap[, l]ike sexual harassment and grabbing her when she didn't want to."[2] Paz, Jose Alfredo Zolorza (whom Romero referred to as "Alfredo" but we will call Zolorza to avoid confusion), De La Torre, and another woman whose name Romero did not know were in or around the motor home at the time. The argument between defendant and Taylor escalated, Romero walked inside the motor home, and Romero heard defendant say, "He needs to die." According to Romero, defendant was standing in front of Taylor holding a knife when she made that statement.

Some in the group then attacked Taylor. Romero saw Paz "on top [of Taylor] socking the fuck out of him" in "[m]aybe like his stomach." Defendant grabbed "like a piece of bar," which was "grayish" and "maybe . . . fourteen, fifteen inches." According to Romero, defendant used it to "whack[ ]" Taylor "[s]omewhere behind his head" while "homeboy was hitting [Taylor] in the stomach." Zolorza was helping to hold Taylor while defendant and Paz were hitting him.

Romero told the police that defendant ordered him to "tie [Taylor's] mouth" and Romero did so by tying a rope around

---

[2] Romero said he was affiliated with the West Side Longo street gang. He was a drug user, but he claimed he "wasn't even high" the day Taylor was killed.

Taylor's mouth after defendant put a sock in it. Taylor was already "pretty bloody" but he was still moving around. At that point, Romero said he left (with De La Torre) and went back home.[3]

Sometime later, according to Romero, defendant arrived at his house asking him to give her a ride back to the motor home because she said she wanted to get "her stuff." Romero declined, but defendant remained outside his house using her phone. Defendant told Romero she was talking to Paz.

Romero overheard defendant "telling him [i.e., Paz] to, you know, basically get rid of him [i.e., Taylor]." Romero recalled defendant saying "something about . . . light the cake" or "turn the candles of the cake on," to signify an order to light the motor home on fire. Romero believed defendant also used the phrase "cut the cake" on the call with defendant, which he understood to mean "to get rid of that person." About an hour later, defendant told Romero that Paz called and said Taylor was dead.[4]

After the prosecution played the recording of the interview during which Romero made the statements just summarized, the prosecution resumed questioning Romero in court and he abandoned his earlier denials and professions of an inability to remember. Romero explained everything he said he saw during the police interview was accurate and he initially claimed

---

[3]     Romero, like De La Torre himself, said De La Torre never went inside the motor home.

[4]     Romero also told the detectives that defendant had claimed to have "people in the inside" and "could tell someone to do a hit on somebody," which he understood to be a claim that she was a "shot caller" and had ties to the Mexican Mafia.

otherwise because he was "affiliated with a gang," there had been attempts on his life as a result of testifying in court, and he was concerned that he was "playing with [his] life by testifying again." Romero also sought to explain or justify his participation in the attack on Taylor by emphasizing defendant had said at the time that she had been raped.

D

The prosecution also called Paz as a witness (he was still in custody serving his sentence for murdering Taylor), at least partly to provide the necessary foundation to admit against defendant recorded statements Paz made (unbeknownst to him at the time) to a jailhouse informant going by the name "Lopez" shortly after his arrest.

Paz testified he was romantically involved with defendant around the time of Taylor's murder, he and defendant "occasionally" lived at the motor home with Taylor and would smoke "crystal meth" there, and on the day of Taylor's murder, Taylor "started arguing with us . . . [asking] why we were there" because Taylor tried to "evict" Paz the previous day. Paz said he was angry and he claimed Taylor "started putting hands on me" and the two then fought for about 15 seconds while defendant stood nearby. According to Paz, the fight "just stopped"; he stayed at the motor home while everyone else left; after a time he left too and went to the "L.A. Canal" to smoke more methamphetamine—taking with him a roughly 20-inch metal rod, which he claimed was his; and he left the rod there when he eventually returned closer to home. Paz denied seeing defendant hit or even start an argument with Taylor, and he denied hearing her order others in the group to tie Taylor up or beat him.

8

To impeach Paz's testimony (and for the jury's substantive consideration (Evid. Code, § 1235)), the prosecution played the full 45-minute-plus recording of Paz's conversation with inmate Lopez during its case-in-chief.

Shortly after Paz was placed in the jail cell with Lopez, Lopez asked if Paz had been to "the joint" already and Paz said yes, adding "fucking right now, they're trying to charge me . . . for murder." Lopez asked Paz if "[t]hey got you" and Paz responded, "Nada, fool. No evidence," but conceded "the only shit[,] the guys, fucking I live with them." Paz told Lopez he (Paz) was the only person "in here," which prompted Lopez to ask why he had been arrested if, as Paz claimed, he "didn't leave no evidence." Paz responded, "I didn't. That's 'cause the thing is that there's me and the hina fool who live with the old man."[5]

Conversation continued about "the hina," and the following exchange ensued:

| [Paz:] | Cause the hina, the main hina . . . |
| [Lopez:] | She's the one fucking pressing the issue? |
| [Paz:] | Nah, she was the one that started it all. |
| [Lopez:] | Oh, is that right? |
| [Paz:] | I just end up . . . |
| [Lopez:] | Finishing it. |
| [Paz:] | Yeah, cleaning. |
| [Lopez:] | Oh, you had to clean up her mess? |
| [Paz:] | No. I ended up finishing and cleaning her |

mess.

---

[5] During his testimony, Paz explained the word "hina" meant "female."

9

After this exchange, Paz again returned to the woman who "lived right there too," adding "[w]e both lived right there with the old man" and were "smoking shit." Paz told Lopez the woman was "from Longo" and when Lopez asked if "she be calling shots," Paz responded, "Big time." Lopez asked Paz, "[I]f she told you what to do, you got to do it?" Paz responded, "Me personally, me, yeah. Me 'cause like either it's me or them, fool."

Paz and Lopez then discussed further the murder charge Paz was then facing. Paz told Lopez "it came on the news," adding "Magnolia and 17th, murder, de-de-de-de. House on fire, they're trying to burn him." Lopez asked Paz whether the fire was started with gas and Paz responded "[p]ropane." Lopez told Paz, "Damn yeah, you're probably straight then," and Paz said, "That's why I'm not sweating it fool." When Lopez asked whether the "whole thing burn[ed]," Paz answered, "Nah."[6]

Paz told Lopez that the police "found the old man burned to death fucking inside his home" and "took everything for evidence."[7] Lopez asked if "he" (i.e., "the old man") tried to fight back, which prompted the following exchange:

[Paz:]        Mm-hmm.

---

[6]     At another point during the conversation, Lopez asked Paz if he knew "what that hina's statements are." The following exchange ensued after that: "[Lopez:] Was she standing next to you when . . . [¶] [Paz:] Nah. We had separate, separate rooms and shit. [¶] [Lopez:] Nah, like, like, when you guys set that shit on fire, was she there? [¶] [Paz:] Hmm? [¶] [Lopez:] Was she with you? [¶] [Paz:] Yeah.

[7]     At a later point in the conversation, Paz used the name "Tom" when referring to the "old man" with whom he was staying.

10

[Lopez:]    Yeah?  He had hands, huh?  Old-ass man had hand[s]?

[Paz:]    ([unintelligible])

[Lopez:]    Let me find out that fool beat you up.

[Paz:]    Nah, ([unintelligible]) fool.  ([unintelligible]) big.

[Lopez:]    Like a pipe?

[Paz:]    Heavy, boom, boom.

[Lopez:]    Yeah, right.  Yeah, that's crazy.  That's a crazy way.  Up, close, and personal.

[Paz:]    Yeah, yeah.

After a police detective came to visit Paz in his jail cell and told him (falsely, in the hope of stimulating further incriminating statements) that the police had recovered video and DNA evidence, Lopez expressed surprise (once the detective left) because Paz said he got rid of everything.  Paz responded, "I did ([unintelligible]) I threw it in the ocean . . . right, all the sand and shit . . . ."

When confronted during his trial testimony with the statements he made during the jailhouse conversation, Paz dismissed the statements incriminating defendant and himself as made up "county jail stories."  Paz did acknowledge, however, that he was using methamphetamine at the time of Taylor's murder and there was "a lot" he did not recall.  He claimed to be sure, however, that defendant did not tell him to kill Taylor.

E

Both Paz and Romero had described the presence of a metal rod or "bar" at the motor home on the day Taylor was killed; Paz claimed he merely took the rod with him to the "L.A. Canal" at

some point after fighting with Taylor, while Romero said he saw defendant hit Taylor in the head with the rod. After the police apprehended defendant and the others following Taylor's death, a police dive team recovered a roughly 20-inch metal rod from the Los Angeles riverbed. Romero was shown a picture of the rod and said it was "the bar that [defendant] was using to hit [Taylor] in the head."

F

At the close of evidence, the parties and the trial court conferred concerning the instructions that should be given to the jury.

The parties and the court eventually agreed that CALCRIM No. 335, concerning testimony from individuals who are accomplices to the crime as a matter of law, should be given and name Paz and Romero as accomplices as a matter of law. The version of CALCRIM No. 335 given to the jury, however, omitted a bracketed paragraph in the pattern instruction (shown in italics below) concerning corroboration when more than one accomplice testifies:

> "If the crime of Murder was committed, then Anthony Paz and David Romero were accomplices to that crime. [¶] You may not convict the defendant of Murder based on the statement or testimony of an accomplice alone. You may use the statement or testimony of an accomplice that tends to incriminate the defendant to convict the defendant only if: [¶] 1. The accomplice's statement or testimony is supported by other evidence that you believe; [¶] 2. That supporting evidence is independent of the

12

accomplice's statement or testimony; [¶] AND [¶] 3. That supporting evidence tends to connect the defendant to the commission of the crime. [¶] Supporting evidence, however, may be slight. It does not need to be enough, by itself, to prove that the defendant is guilty of the charged crime, and it does not need to support every fact mentioned by the accomplice in the statement or about which the witness testified. On the other hand, it is not enough if the supporting evidence merely shows that a crime was committed or the circumstances of its commission. The supporting evidence must tend to connect the defendant to the commission of the crime. [¶] *[The evidence needed to support the (statement/ [or] testimony) of one accomplice cannot be provided by the (statement/ [or] testimony) of another accomplice.]* [¶] Any statement or testimony of an accomplice that tends to incriminate the defendant should be viewed with caution. You may not, however, arbitrarily disregard it. You should give that statement or testimony the weight you think it deserves after examining it with care and caution and in light of all the other evidence."

The parties also discussed whether the court should instruct the jury with CALCRIM No. 334, concerning testimony from individuals who *may* be an accomplice if the jury so finds, with respect to De La Torre.[8] The court opined that it did not

---

[8]     The pattern instruction provides guidance on how to resolve a dispute over whether a witness is an accomplice,

13

hear anything during De La Torre's testimony that "would indicate he could be construed as an accomplice." Defense counsel agreed with the court's view, as did the prosecution—emphasizing De La Torre remained outside the motor home and was never charged. The court accordingly gave no CALCRIM No. 334 instruction to the jury with respect to De La Torre's testimony.

Without objection or comment from the parties, the trial court also stated it would give CALCRIM No. 358, concerning evidence of a defendant's out-of-court statements, to the jury. The instruction as given, however, omitted a bracketed paragraph at the end (shown in italics below) that specifies a jury should consider any non-written or recorded statement by the defendant with caution: "You have heard evidence that the defendant made an oral statement before the trial. You must decide whether the defendant made any such statement, in whole or in part. If you decide that the defendant made such a statement, consider the statement, along with all the other evidence, in reaching your verdict. It is up to you to decide how much importance to give to the statement. *[Consider with caution any statement made by (the/a) defendant tending to show*

explaining that an accomplice is someone "subject to prosecution for the identical crime charged against the defendant." (CALCRIM No. 334.) The pattern instruction further explains that someone is subject to prosecution if he or she is the direct perpetrator or an aider and abettor, that the burden is on the defendant to prove a witness is an accomplice, and that mere presence at the scene of a crime is neither necessary nor alone sufficient to establish a witness is an accomplice. (CALCRIM No. 334.)

14

*(his/her) guilt unless the statement was written or otherwise recorded.]"*

During closing argument, the prosecution argued the jury could convict defendant for murdering Taylor either as a direct perpetrator (emphasizing Romero's testimony that he saw her hit Taylor in the head with the metal rod) or as an aider and abettor (emphasizing defendant's presence during at least part of the assault on Taylor, her "orders" to others in the group, her statements that she wanted Taylor dead, and the evidence suggesting Paz "finished" Taylor and lit the motor home on fire). The prosecution did not argue Romero and Paz provided the necessary corroboration for each other's testimony, but the prosecution did argue De La Torre corroborated Paz and Romero's recounting of defendant's statements evincing an intent to kill Taylor. The defense, during its closing argument, maintained Paz killed Taylor on his own and the prosecution's position that defendant was "some queen pin, some gangster on a high level that can order grown men to tie up and kill another man" was "ridiculous."

The jury deliberated and convicted defendant of first degree murder. The trial court sentenced her to 25 years to life in prison.

II

Defendant argues there were three errors in instructing the jury, but we shall affirm the judgment because there was only one error and that error was harmless.

The parties agree, as do we, that the trial court should have instructed the jury with the bracketed paragraph in CALCRIM No. 335 stating the necessary corroboration for an accomplice's

15

testimony cannot come from another accomplice's testimony. That error did not prejudice defendant, however, because the necessary corroboration need only be "slight," and there is no reasonable possibility the jury would have found insufficient corroboration for Paz's and Romero's testimony in light of De La Torre's testimony that tended to connect defendant to commission of Taylor's murder.[9]

We reject defendant's argument that the court erred in not giving a CALCRIM No. 334 accomplice instruction as to De La Torre.  There was no substantial evidence presented at trial that would have allowed the jury to find he was subject to prosecution for murder by standing outside the motor home (there was no evidence he ever went inside) on the night Taylor was killed.

Finally, defendant forfeited his claim that the CALCRIM No. 358 instruction (out-of-court statements by a defendant) was incomplete by not objecting in the trial court to the instruction given, and his related ineffective assistance of counsel claim fails on prejudice grounds.


A

We have already reproduced the CALCRIM No. 335 accomplice-as-a-matter-of-law instruction that was given with respect to Paz and Romero, and it is undisputed that the omission of the bracketed portion was error.  (See, e.g., *People v.*

---

[9]	In light of this holding, it is unnecessary for us to decide whether the metal rod provided further corroboration for Romero's testimony (including his recorded police interview, during which he stated he saw defendant hit Taylor in the head with a grayish metal "bar").

16

*Rangel* (2016) 62 Cal.4th 1192, 1222 ["[T]he testimony of one accomplice cannot corroborate that of another accomplice"].) So the question is prejudice.

Defendant concedes De La Torre's testimony could have "potentially" provided "some corroboration," and that is right—albeit understated: De La Torre directly connected defendant to commission of Taylor's murder by testifying he saw defendant arguing with Taylor in the motor home on the night he was killed, he saw defendant "smack" Taylor multiple times in the face while "everyone" was holding him down, he saw defendant shove a sock in Taylor's mouth and order everyone to tie Taylor up, and he heard defendant say "let's end this" to the others and say that she was "going to finish this motherfucker." Defendant argues, however, the corroboration provided by De La Torre is insufficient for two reasons: because she believes the jury should have been asked to decide De La Torre was an accomplice too (a point to which we turn in the next section) and because the jury may have disbelieved De La Torre because he was a gang member, methamphetamine user, and gave an "evasive" answer about why he went to the motor home in the first place.

None of these three proffered reasons leaves us convinced there is a reasonable possibility the jury would not have found De La Torre provided the requisite "slight" corroboration for Paz and Romero. (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 303 ["'A trial court's failure to instruct on accomplice liability under [Penal Code] section 1111 is harmless if there is sufficient corroborating evidence in the record.' [Citation.] 'Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense'"].) All of the witnesses at the scene of the murder (and

17

defendant) were methamphetamine users at the time of the crime, and we accordingly doubt the jury would have disbelieved De La Torre's testimony just for that reason. Defendant also overstates matters when she says De La Torre had a motive to falsely corroborate both Paz and Romero because they were from the "same gang" (De La Torre testified he was affiliated with the East Side Longo gang while Romero was from West Side Longo), and regardless, we see no reasonable likelihood that gang membership would have caused the jury to disbelieve De La Torre. To the contrary, there was a great deal of testimony at trial (some elicited even by the defense) that a gang member places himself at significant personal risk by "snitching" and testifying against others—and De La Torre's testimony inculpated not just defendant, but also Paz and Romero by placing them at the scene of the crime and, in the case of Paz, on the phone with defendant later discussing whether "it" was "done."[10]

B

"[Penal Code] [s]ection 1111 bars any conviction predicated on 'testimony of an accomplice unless it [is] corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense.' An accomplice is 'one who is liable to

_____

[10] We also see nothing "evasive" about De La Torre's answer about why he went to the motor home—and, apparently, neither did the defense at trial: it was not a point pursued on cross-examination and the defense agreed De La Torre could not be viewed as an accomplice when the parties discussed the jury instructions that should be given.

18

prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given.' (*Ibid*.) 'To be chargeable with an identical offense, a witness must be considered a principal under [Penal Code] section 31.' (*People v. Lewis* (2001) 26 Cal.4th 334, 368-369 [ ]; see [Pen. Code,] § 31 [defining 'principal'].) In other words, there must be evidence of that person's 'guilt . . . based on a combination of the direct perpetrator's acts and the aider and abettor's own acts and own mental state.' [Citation.] [¶] Only when there is 'substantial evidence that a witness who has implicated the defendant was an accomplice' must the trial court instruct on 'the principles regarding accomplice testimony.' (*People v. Houston* (2012) 54 Cal.4th 1186, 1223; see *Lewis*, *supra*, 26 Cal.4th at [ ] 369 ['Substantial evidence is "evidence sufficient to 'deserve consideration by the jury.'"'])" (*People v. Johnsen*, 10 Cal.5th 1116, 1155; see also *Houston*, *supra*, at 1224 ["An accomplice is someone subject to prosecution for the charged crimes by reason of aiding and abetting or being a member of a conspiracy to commit the charged crimes. [Citations.] "'An accomplice must have "'guilty knowledge and intent with regard to the commission of the crime'"'"].)

Under these well-established principles, giving a CALCRIM No. 334 accomplice instruction as to De La Torre was only warranted if there was substantial evidence that he was subject to prosecution for aiding and abetting Taylor's murder.[11]

---

[11] Citing *Rangel*, *supra*, 62 Cal.4th at pages 1222 to 1223, the Attorney General argues defendant has "waived" the contention that CALCRIM No. 334 should have been given as to De La Torre because his trial attorney agreed with the court that such an

19

There was not. The undisputed evidence at trial was that De La Torre watched the attack on Taylor from outside the motor home and left the area before Taylor was killed. There was also evidence he visited Romero's home later and overheard a conversation between defendant and Paz. None of that provides substantial evidence of the actus reus or mens rea that would be required for De La Torre to be subject to prosecution for murder. (See generally *People v. Curiel* (2023) 15 Cal.5th 433, 467 ["'[P]roof of aider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea'—which here includes knowledge that the direct perpetrator intends to commit the crime or life-endangering act, 'and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime'"]; see also *People v. Strickland* (1974) 11 Cal.3d 946, 958; *People v. Pettie* (2017) 16 Cal.App.5th 23, 57 ["'Mere presence at the scene of a crime which does not itself assist its commission or mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting'"].)

C

In the trial court, the defense did not object to the CALCRIM No. 358 instruction as delivered, i.e., without the bracketed paragraph instructing jurors to consider inculpatory out-of-court statements by the defendant with caution if not written or recorded. Because the trial court has no sua sponte

---

instruction should not be given. We will assume for argument's sake that the contention is preserved.

obligation to give a CALCRIM No. 358 instruction at all (*People v. Diaz* (2015) 60 Cal.4th 1176, 1190), the absence of an objection to the instruction as delivered forfeits the challenge to the instruction that defendant now advances on appeal.

Anticipating the forfeiture problem, defendant argues the absence of an objection to the instruction in the trial court constitutes ineffective assistance of counsel. This ineffective assistance of counsel claim fails too because defendant has not established the requisite prejudice. (*People v. Carter* (2005) 36 Cal.4th 1114, 1189 [a defendant has the burden to establish ineffective assistance of counsel, i.e., representation by counsel that fell below and objective standard of reasonableness and resulting prejudice sufficient to undermine confidence in the outcome of the proceeding]; see also *Strickland v. Washington* (1984) 466 U.S. 668, 697 ["If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed"]; *Diaz*, *supra*, 60 Cal.4th at 1196 ["the instructions provided by the trial court concerning witness credibility informed the jury of the need to evaluate the witnesses' testimony for possible inaccuracies and determine whether the statement was in fact made. The jury[, as in this case,] was instructed with CALCRIM No. 226, which sets out the numerous factors the jury may consider in deciding whether a witness's testimony is credible. '[W]hen the trial court otherwise has thoroughly instructed the jury on assessing the credibility of witnesses, we have concluded the jury was adequately warned to view their testimony with caution'"].)

Defendant believes otherwise because she asserts "a large portion of the prosecution's case . . . was based upon her

21

unrecorded out of court statements." There was quite strong evidence of defendant's guilt, however, even apart from those statements based on what other witnesses saw and said themselves. Romero *saw* defendant "whack" Taylor in the head with a metal "bar" and shove a sock in his mouth at the point when he was already "pretty bloody." De La Torre too *saw* defendant shoving a sock in Taylor's mouth, and he saw her smacking him repeatedly in the face while others were holding him down. And Paz unknowingly admitted to a jailhouse informant that defendant was "the one that started it all" and he had to "finish[ ] and clean[ ] her mess."

D

Although we have disposed of defendant's principal arguments on appeal, two issues remain that require less extensive discussion. Defendant argues the claimed instructional errors we have already discussed were cumulatively prejudicial even if not prejudicial when considered individually. We hold otherwise; the asserted (and in one case substantiated) instructional errors did not deprive defendant of a fair trial. (*Chambers v. Mississippi* (1973) 410 U.S. 284; *People v. Hin* (2025) 17 Cal.5th 401, 508.) Defendant also argues the trial court miscalculated her actual custody credits at sentencing—the correct figure being 3,217 days of credit—and the Attorney General fully agrees with defendant. We will order the actual custody credits corrected accordingly.

DISPOSITION

The clerk of the superior court shall prepare an amended abstract of judgment that gives defendant 3,217 days of actual custody credit (with any further conduct credit to be calculated by CDCR).  In all other respects, the judgment is affirmed.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, Acting P. J.


We concur:



MOOR, J.



KIM (D.), J.



23